# United States Court of Appeals
## For the First Circuit

No. 13-1065

UNITED STATES,

Appellee,

v.

MARVA ADORNO-MOLINA,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan Pérez-Giménez, U.S. District Judge]


Before

Howard, Selya, and Lipez,
Circuit Judges.

Raymond L. Sanchez Maceira for appellant.
Juan Carlos Reyes-Ramos, Assistant United States Attorney,
with whom Rosa Emilia Rodríquez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

December 19, 2014

**LIPEZ, Circuit Judge**. Appellant Marva Adorno-Molina ("Adorno") was convicted on drug trafficking conspiracy and money laundering charges related to her involvement in a wide-ranging drug trafficking organization led by Angel Ayala-Vazquez ("Ayala"). Adorno challenges her drug conspiracy conviction on sufficiency grounds. She also argues that her money laundering conviction should be vacated pursuant to United States v. Santos, 553 U.S. 507 (2008), because the government failed to prove that the monies laundered were "net profits" of drug-trafficking, not merely "gross revenues." Additionally, she contends that the district court erred when it gave a willful blindness instruction to the jury, and when it relied on the money laundering proceeds to establish a base offense level at sentencing. We reject Adorno's arguments and affirm the convictions and sentence.

**I.**

Because Adorno's appeal follows the jury's finding of guilt, and she challenges the sufficiency of the evidence, we view the facts in the light most favorable to the verdict. United States v. Rodríquez, 731 F.3d 20, 23 (1st Cir. 2013).

Ayala was the leader of a drug trafficking organization ("DTO") using as its base the Jose Celso Barbosa Public Housing Project and the Sierra Linda Public Housing Project in Bayamón,

Puerto Rico.[1]  Ayala's DTO required many vehicles to transport drugs and firearms, secure proceeds from drug sales, and elude authorities.  Alberto Meléndez-Sáez ("Meléndez") was in charge of procuring vehicles for Ayala's DTO.

In 2007, Adorno was a financing manager for Bella International's Honda and Acura dealership on Kennedy Avenue in San Juan, Puerto Rico.  During her time at Bella International, Adorno befriended Meléndez and assisted him with procuring many vehicles.  Meléndez and Adorno would use "straw owners" to conceal the fact that the vehicles were being purchased for Ayala's DTO.  Adorno and Meléndez would recruit prospective straw owners by seeking out individuals in need of extra money.  They would tell the straw owners that professionals with bad credit required assistance purchasing vehicles.  Adorno and Meléndez paid the straw owners $2,000 to $5,000 per vehicle once they signed the purchase documents and became the registered owner of a vehicle.

For example, one straw owner, Mary Soto, testified that Adorno convinced her to act as a straw owner for five vehicles from July to September 2007 by using the professionals with bad credit

---

[1] Ayala was convicted of multiple charges relating to his leadership of the drug trafficking organization and is serving a life sentence.  See United States v. Ayala-Vazquez, 751 F.3d 1, 6 (1st Cir. 2014).

rationale.  In exchange for signing the purchase documents, Meléndez paid Soto $4,000 to $5,000 per vehicle.

Although the cars were technically titled in the straw owners' names, they never drove the cars.  Instead, Meléndez or individuals who worked with him would pick up the vehicles directly from the dealership lot.  Meléndez and Adorno also paid for all vehicle-related expenses, including the down payment, monthly loan payments, and insurance.

Meléndez and Adorno procured cars from both Bella International and other dealerships in Puerto Rico.  At Bella International, they usually worked with the same salesperson, Luis Martínez.  Martínez testified that whenever Meléndez wanted to purchase a vehicle, the transaction was "very easy" and was "squared away" by Adorno and Meléndez ahead of time.  All Martínez had to do was find the requested vehicle from the dealership lot.  Instead of delivering the vehicle to the straw owner who signed the purchase documents, Martínez would give the car directly to Meléndez.

Meléndez would visit Adorno at Bella International at least three times per week.  Adorno liked to conduct business with Meléndez in private.  Whenever they would exchange money in her office, Adorno would ask Martínez to leave them alone.  Nevertheless, at times, Martínez saw Meléndez deliver cash to Adorno, either from his pockets or in a paper bag.

Top management at Bella International became concerned about Adorno's business practices. The accounts receivable for many of her clients were not paid on time, and many payments were more than 30 days late. Bella International had difficulty when it tried to collect on those accounts because the documentation completed by Adorno contained inaccurate information. Her supervisor, José Colon Ayala, investigated her sales and discovered that many of Adorno and Martínez's clients would purchase multiple cars in a brief one-to-two month period as straw owners for other individuals. As a result of the investigation, Bella International fired both Adorno and Martínez in October 2007. After her dismissal from Bella International, Adorno continued to help Meléndez procure cars from other dealerships. For example, in December 2007, she helped straw owner Agustín Treviño purchase five cars from the Autocentro, Autogermana, Lexus de San Juan, and Triangle Honda dealerships.

Many of the vehicles purchased through Adorno and Meléndez's scheme were later used in criminal activity, some of which was linked to Ayala's DTO. For example, in May 2009, a white BMW with license plate HFQ 548 was involved in a murder and shootout at Pájaros Park. The same vehicle had been purchased by Treviño in December 2007. After the shootout, the police stopped the white BMW, arrested its three occupants, and seized the vehicle and four Glock pistols found inside. Police Sergeant Benjamín

Burgos-Del Toro testified that members of Ayala's DTO were involved in the shootout.

Other vehicles purchased through the scheme were driven by members of Ayala's DTO. On May 11, 2009, the police stopped Diego Cardona while he was driving a white Acura MDX with license plate HAC 284. Earlier that morning, FBI Special Agent Joseph González observed Ayala himself driving the same vehicle. The Acura MDX had been purchased at Bella International by straw owner Arenymar Ortíz-Valle under Adorno's direction.

Some straw owners became concerned when they learned that the vehicles they had purchased were connected to criminal activity. For example, in 2008, an agent from the U.S. Drug Enforcement Administration ("DEA") contacted Treviño after the DEA had confiscated a black Toyota Highlander he had purchased. Treviño subsequently contacted Adorno, who told him that the vehicle was confiscated because "[the driver] got stopped for something . . . and the person was carrying I think more than $10,000.00 and he couldn't prove that it was from his business." Adorno instructed Treviño to retrieve the vehicle. She arranged for Treviño to meet with an individual at Toyota Credit, where the DEA had transferred the black Highlander. The individual paid Toyota Credit approximately $40,000 to pay off the remainder of the loan amount and obtain the vehicle.

A few weeks later, Treviño learned from the newspaper that a gray Toyota Highlander, similar to one that he had purchased under Adorno's direction, had been involved in a crime. Treviño again contacted Adorno, who instructed him to report the car as stolen. Treviño refused and asked Adorno to return to him all of the vehicles he had purchased. In response, Adorno said: "[Y]ou know what, if I was you I would just be quiet because this thing is bigger than what you think it is, and there is a lot of people involved in this." Scared by Adorno's warning, Treviño agreed to be quiet and did not bring up the issue again.

In addition to acquiring vehicles, Adorno also procured an apartment used by Ayala's DTO. In June 2009, she helped obtain a lease on an apartment located at the Astralis Condominium complex in Isla Verde. She personally paid the apartment's $2,050 monthly rent from June to October 2009. In February 2010, the DEA executed a search warrant for the apartment and found drug packing materials, loaders for semiautomatic weapons, ammunition boxes, and $240,260 in cash. The apartment also contained several documents, including a DEA investigation report about Ayala's DTO and a vehicle registration for a BMW M5 registered in Adorno's name.

Adorno was arrested on October 2, 2009. She was charged with conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (count one) and conspiracy to launder money in violation of 18 U.S.C. § 1956 (count

nine), as one of 65 defendants in a multi-defendant, eleven-count indictment relating to Ayala's drug trafficking activities. After a ten-day trial, in which she was tried alone, Adorno was found guilty on both counts. The district court sentenced Adorno to 121 months' imprisonment as to each count, to be served concurrently. This timely appeal followed.

## II.

Adorno raises three challenges to her convictions: sufficiency challenges to the drug trafficking and money laundering conspiracy convictions as well as a claim of instructional error. We review each in turn.

### A. Drug Trafficking Conspiracy

We review preserved challenges to the sufficiency of evidence de novo. United States v. Ihenacho, 716 F.3d 266, 279 (1st Cir. 2013). In analyzing such claims, we consider "'whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt.'" United States v. Willson, 708 F.3d 47, 52 (1st Cir. 2013) (quoting United States v. Poulin, 631 F.3d 17, 22 (1st Cir. 2011)).

To sustain a conspiracy conviction under § 846, "the evidence must show that: (1) a conspiracy existed; (2) the defendant had knowledge of the conspiracy; and (3) the defendant

-8-

knowingly and voluntarily participated in the conspiracy." United States v. Maryea, 704 F.3d 55, 73 (1st Cir. 2013). To prove the third element, the government must establish "that the defendant both intended to join the conspiracy charged and intended to effectuate the objects of that conspiracy." Id. The defendant's specific intent "may be established through circumstantial evidence alone." United States v. Cortés-Cabán, 691 F.3d 1, 15 (1st Cir. 2012).

Adorno concedes that the evidence presented at trial was sufficient to establish a drug trafficking conspiracy led by Ayala, and that Meléndez participated in the conspiracy by procuring cars through straw owners. Adorno also admits that the government established that she knew or was willfully blind "that something illegal was afoot" in her scheme for procuring vehicles. However, Adorno argues that the government failed to prove that she knowingly participated in the conspiracy because the evidence did not show that she was aware that the cars she helped Meléndez acquire were being used for Ayala's DTO.

Adorno's argument is unavailing. The record contains ample circumstantial evidence to demonstrate that Adorno knew she was assisting Ayala's DTO through her actions. First, Adorno had a close working relationship with Meléndez, who visited her at least three times per week at Bella International to purchase cars through straw owners for Ayala's DTO. Because of their close

working relationship involving matters essential to the operations of the DTO, the jury could, in the circumstances of this case, reasonably infer that Adorno knew that the vehicles she obtained with Meléndez -- an Ayala associate -- were in furtherance of a drug-trafficking conspiracy led by Ayala. Cf. United States v. Azubike, 564 F.3d 59, 64-65 (1st Cir. 2009) (finding that a jury could infer that defendant knew that drugs were inside his briefcase because of his close relationship with drug trafficker). The fact that Meléndez entrusted Adorno to facilitate the acquisition of vehicles for Ayala's DTO further supports this conclusion. See id. at 65 ("[D]rug organizations do not usually take unnecessary risks by trusting critical transactions to outsiders." (internal quotation marks omitted)).

Second, vehicles obtained through Adorno were subsequently involved in criminal activity linked to Ayala's DTO and were seen driven by Ayala and his associates. When straw owner Agustín Treviño contacted Adorno after discovering that a gray Toyota Highlander he had purchased was involved in a crime, she warned him to be quiet because "this thing is bigger than what you think it is, and there is a lot of people involved in this." Adorno's statement creates a reasonable inference that she not only knew "that something illegal was afoot" but also the specific nature of the underlying criminal activity, a wide-ranging drug trafficking conspiracy involving Ayala, Meléndez, and others.

-10-

Finally, Adorno obtained a lease on an apartment at the Astralis Condominium complex used by Ayala's DTO. The apartment directly connects Adorno to the drug trafficking conspiracy. She paid for the apartment every month until her arrest in October 2009. When DEA agents searched the apartment, they found drug packing materials, weapons, $240,260 in cash, a car registration document in Adorno's name, and a DEA investigation report about Ayala's DTO. Adorno's relationship with Meléndez, the vehicles' involvement in crimes linked to Ayala's DTO, and Adorno's connection to the Astralis Condominium apartment are sufficient circumstantial evidence to permit a reasonable jury to conclude that Adorno knew she was assisting Ayala's DTO with her actions.[2]

## B. Money Laundering Conspiracy

Adorno challenges her conviction for money laundering in violation of 18 U.S.C. § 1956 on the ground that the government did not prove that the money she laundered was the "net profits" of

---

[2] Adorno also contends that the trial evidence regarding her drug trafficking conspiracy conviction prejudicially varied from the allegations in her indictment. While the government may have proven a conspiracy between Adorno and Meléndez, she argues that it failed to connect Adorno to Ayala's DTO. The parties dispute whether Adorno properly preserved this argument in the district court and whether we should apply de novo or a more deferential standard of review. We do not need to resolve this dispute because, even under de novo review, Adorno's argument has no merit. Adorno's variance argument simply rehashes her sufficiency argument and fails for the same reasons. See Maryea, 704 F.3d at 73 (rejecting "[a] claim that the Government's proof varied impermissibly from the charges contained in the indictment" where it "is essentially a challenge to the sufficiency of the evidence" (internal quotation marks omitted)).

drug-trafficking in accordance with <u>United States</u> v. <u>Santos</u>, 553 U.S. 507 (2008).  The government argues that, properly read, <u>Santos</u> only requires it to demonstrate that the laundered funds were "gross revenues" from the sale of illicit drugs.  We review this preserved question of law de novo.  <u>See</u> <u>United States</u> v. <u>Troy</u>, 618 F.3d 27, 31 (1st Cir. 2010).

Section 1956 makes it a crime to engage in a "financial transaction" involving "the proceeds of specified unlawful activity" with the intent either to "promote the carrying on" of that activity, or to "conceal or disguise" the proceeds of that activity.  18 U.S.C. § 1956.  In <u>Santos</u>, the Supreme Court had to determine whether "proceeds" should be interpreted broadly to mean "receipts" of specified unlawful activity or narrowly to include only the "profits" of such activity.  553 U.S. at 509.  Santos had been convicted of operating an illegal lottery in violation of 18 U.S.C. § 1955, as well as conspiracy to launder money and money laundering involving funds derived from the lottery.  <u>Id.</u> at 509–10.  The transactions underlying Santos's money laundering conviction involved his payments to employees who collected bets from gamblers, as well as payments to the lottery winners.  <u>Id.</u> Applying the rule of lenity, a four-Justice plurality held that the word "proceeds" in § 1956 means "profits."[3]  <u>Id.</u> at 510–14.  The

_____

[3] In response to the plurality's opinion in <u>Santos</u>, Congress amended § 1956 in 2009 to define "proceeds" as "gross receipts" in all cases.  <u>See</u> Fraud Enforcement and Recovery Act of 2009, Pub. L.

-12-

plurality was concerned that "[i]f 'proceeds' meant 'receipts,' nearly every violation of the illegal-lottery statute would also be a violation of the money laundering statute." Id. at 515. That would be so because "paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." Id. This would create a "merger" problem -- prosecutors could charge money-laundering, with its twenty-year maximum sentence, in any lottery case, even though the lottery statute carried a maximum of five years. Id. at 516.

Justice Stevens delivered the tie-breaking vote. He concurred in the judgment that "proceeds" means "profits" where the specified unlawful activity is illegal gambling because the legislative history of § 1956 was silent as to this type of activity, and, therefore, the rule of lenity should apply. Id. at 524-28 (Stevens, J., concurring). However, Justice Stevens reasoned that the definition of "proceeds" could vary depending on which unlawful activity formed the predicate for the money laundering charge. Id. at 525. Justice Stevens agreed with the four dissenting Justices that "the legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the

---

No. 111-21, § 2(f)(1), 123 Stat. 1617, 1618 (2009) (codified at 18 U.S.C. § 1956(c)(9)). The amendment is not retroactive and, therefore, has no effect on this case because Adorno's charges stem from her conduct in 2007 and 2008. See United States v. Grasso, 724 F.3d 1077, 1092 (9th Cir. 2013).

-13-

operation of organized crime syndicates involving such sales." Id. at 525-26; see also id. at 532 n.1 (Alito, J., dissenting)("not[ing] that five Justices agree with the position taken by Justice Stevens on [this] matter").

Justice Stevens's concurrence is the controlling law. See Santos, 553 U.S. at 523 (plurality opinion) ("Since [Justice Stevens's] vote is necessary to our judgment, and since his opinion rests upon the narrower ground, the Court's holding is limited accordingly."); see also Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation marks omitted)).

In Santos, a majority of the Supreme Court (Justice Stevens and the four dissenting Justices) reasoned that "proceeds" means "gross revenues" -- not "profits" -- when the predicate offense involves the "sale of contraband and the operation of organized crime syndicates involving such sales." 553 U.S. at 526. Drug trafficking is one such offense. Therefore, Adorno's argument fails because the government needed to prove only that the laundered funds were gross revenues of Ayala's DTO, which Adorno concedes that it did. Our sister circuits have uniformly come to the same conclusion. See, e.g., United States v. Richardson, 658

-14-

F.3d 333, 340 (3d Cir. 2011) (holding that "'proceeds' means gross receipts" in drug trafficking case); <u>Wilson</u> v. <u>Roy</u>, 643 F.3d 433, 436-37 (5th Cir. 2011) (finding that "when the laundered money is derived from the sale of drugs and other contraband, Congress used 'proceeds' in § 1956 to mean receipts rather than profits" because "five Justices agree with the position taken by Justice Stevens on the matter"); <u>United States</u> v. <u>Quinones</u>, 635 F.3d 590, 600 (2d Cir. 2011) (holding that "'proceeds' under 18 U.S.C. § 1956 are not limited to 'profits' at least where, as here, the predicate offense involves the sale of contraband"); <u>Brace</u> v. <u>United States</u>, 634 F.3d 1167, 1170 n.3 (10th Cir. 2011) ("<u>Santos</u> does <u>not</u> hold that 'proceeds' means 'profits' in the context of drug sales. Justice Stevens, the critical fifth vote in <u>Santos</u>, explicitly departed from the plurality's conclusion that 'proceeds' means 'profits' in the context of drug sales.") (emphasis in original); <u>United States</u> v. <u>Webster</u>, 623 F.3d 901, 906 (9th Cir. 2010) ("We . . . read <u>Santos</u> as holding that where, as here, a money laundering count is based on transfers among co-conspirators of money from the sale of drugs, 'proceeds' includes all 'receipts' from such sales."); <u>United States</u> v. <u>Smith</u>, 601 F.3d 530, 544 (6th Cir. 2010) ("As Justice Stevens made clear in his concurring opinion in <u>Santos</u>, the predicate offense of conspiracy to distribute cocaine does not fall within the category of offenses for which 'proceeds' means 'profits.'"); <u>United States</u> v. <u>Spencer</u>, 592 F.3d 866, 879 (8th Cir.

-15-

2010) ("[T]his court agrees . . . that <u>Santos</u> does not apply in the drug context."); <u>United States</u> v. <u>Demarest</u>, 570 F.3d 1232, 1242 (11th Cir. 2009) (concluding that "the narrow holding in <u>Santos</u>" does not apply when "the laundered funds were the proceeds of an enterprise engaged in illegal drug trafficking").

## C. Willful Blindness Instruction

Adorno contends that the district court erred when it gave a willful blindness instruction to the jury on the money laundering count. She has preserved her challenge to the giving of the instruction. Although "[w]e have not definitively resolved what standard of review we apply to the district court's decision to give a willful blindness instruction," <u>United States</u> v. <u>Appolon</u>, 695 F.3d 44, 63 (1st Cir. 2012) (internal citation omitted), we do not need to resolve that issue here because Adorno's claim fails even under de novo review.

A willful blindness instruction is appropriate if "(1) a defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge." <u>Azubike</u>, 564 F.3d at 66. Adorno argues that the facts presented at her trial were insufficient to justify the instruction. Specifically, she contends that the trial evidence could not prove that Adorno knew or was willfully blind to the fact

-16-

that the money she laundered through car sales came from Ayala's DTO.

The district court did not err in giving the willful blindness instruction. As demonstrated above, see Part II.A supra, there was sufficient circumstantial evidence that Adorno either knew or deliberately ignored that the laundered proceeds originated from Ayala's DTO. The instruction was warranted because "the record evidence reveals 'flags' of suspicion that, uninvestigated, suggest willful blindness." Azubike, 564 F.3d at 66 (quoting United States v. Epstein, 426 F.3d 431, 440 (1st Cir. 2005)). The use of straw owners to purchase vehicles, the frequent cash transfers between Adorno and Meléndez, and the vehicles' involvement in crimes linked to Ayala's DTO were "sufficient warning signs [to Adorno] that call out for investigation or evidence of [her] deliberate avoidance of knowledge" of the money laundering conspiracy. Id.

## III.

Adorno also challenges her 121-month sentence. She argues that the district court erred when it relied on the money laundering proceeds to establish a base offense level at sentencing. Adorno's argument has two parts. First, she contends that the district court failed to give advance notice under Federal Rule of Criminal Procedure 32(h) that it intended to use the value of the laundered funds -- instead of the quantity of drugs -- to

calculate a base offense level under the advisory Sentencing Guidelines. Second, she contends that the district court's calculation of $1,153,137.30 in laundered funds was inaccurate. Both contentions fail.

Because Adorno did not raise these sentencing challenges in the district court, we review for plain error. See United States v. Fernández-Hernández, 652 F.3d 56, 71 (1st Cir. 2011) ("When a defendant fails to preserve an objection below, the plain error standard supplants the customary standard of review." (alteration omitted)). To succeed on plain error review, Adorno must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Ahrendt, 560 F.3d 69, 76 (1st Cir. 2009) (internal quotation marks and citation omitted). In the sentencing context, a defendant must demonstrate that, but for the error, there is a reasonable probability that the court would have imposed a more favorable sentence. See id. at n.5.

## A. Notice Under Federal Rule of Criminal Procedure 32(h)

Prior to Adorno's sentencing, the probation officer prepared a presentence investigation report ("PSR") that calculated Adorno's base offense level using the quantity of drugs underlying her drug-trafficking conspiracy conviction. Adorno challenged the

-18-

probation officer's determination on the ground that the government failed to prove the exact quantity of drugs that was attributable to, or foreseeable by, Adorno. See Fernández-Hernández, 652 F.3d at 71; United States v. Colón-Solís, 354 F.3d 101, 103-04 (1st Cir. 2004). At sentencing, the district court did not resolve the dispute. The court ignored the probation officer's recommendation to determine Adorno's base offense level using the quantity of drugs, and instead relied on the amount of laundered funds, which it calculated to be $1,153,137.30.

Adorno does not dispute that the district court was permitted to rely on the value of the laundered funds to calculate her base offense level under the Sentencing Guidelines.[4] See U.S.S.G. § 2S1.1(a)(2). However, she argues that the court should have given her advance notice under Fed. R. Crim. P. 32(h) that it was planning to do so. Rule 32(h) states that "[b]efore the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure." In Irizarry v. United States, the Supreme Court interpreted Rule 32(h)

---

[4] Section 2S1.1(a) of the Sentencing Guidelines states that when an defendant is convicted of money laundering, the base offense level can either be established using "[t]he offense level for the underlying offense from which the laundered funds were derived" -- in this case, the quantity of drugs underlying Adorno's drug-trafficking conspiracy conviction -- or "the number of offense levels . . . corresponding to the value of the laundered funds."

narrowly, holding that the rule applies only to authorized "departures" under the Sentencing Guidelines and not to "variances," non-Guidelines sentences that result from the sentencing judge's consideration of factors under 18 U.S.C. § 3553. See 553 U.S. 708, 714 (2008) (holding that Rule 32(h) "does not apply to 18 U.S.C. § 3553 variances by its terms. 'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines."). In this case, the district court sentenced Adorno to 121 months, which was within the Guideline range of 121 to 151 months. Therefore, Rule 32(h) is inapplicable to Adorno's sentence.

## B. Amount of Laundered Funds

In a money laundering conspiracy, the amount of laundered funds attributable to a defendant "includes not only that which he handled but also the amount he could reasonably have foreseen would be laundered through the conspiracy." United States v. Rivera-Rodríguez, 318 F.3d 268, 273 (1st Cir. 2003) (citing U.S.S.G. § 1B1.3(a)(1)). When calculating the amount of loss to determine an offense level for sentencing purposes, a district court "need only make a reasonable estimate of the loss." Ihenacho, 716 F.3d at 278 (citing U.S.S.G. § 2B1.1, cmt. n.3(C)). The court's calculation is entitled to deference because it "is in

a unique position to assess the evidence and estimate the loss based upon that evidence." U.S.S.G. § 2B1.1, cmt. n.3(C).

Adorno argues that the district court erred in calculating the amount of laundered funds attributed to her as $1,153,137.30, producing a base offense level of 24. See id. §§ 2S1.1(b)& 2B1.1. However, she has not offered an alternative to the district court's tally. Although the court did not provide any explanation for its calculation, the government argues that the trial record shows twenty car purchases, eighteen car insurance payments, and two cash deposits attributable to Adorno, which totaled $1,155,948.91. The government's figure would also have established a base offense level of 24. See id.

Based upon our own detailed review of the record, the district court's calculation appears to be a "reasonable estimate" of the amount of laundered funds attributable to Adorno. Id. § 2B1.1, cmt. n.3(C). Therefore, there was no plain error.

Affirmed.