# United States Court of Appeals
## For the First Circuit

No. 15-1620

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE RIVERA-IZQUIERDO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Barron, Stahl, and Lipez,
Circuit Judges.

David Shaughnessy for appellant.
James I. Pearce, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Leslie R. Caldwell, Assistant Attorney General, Criminal Division, Sung-Hee Suh, Deputy Assistant Attorney General, Criminal Division, Wifredo A. Ferrer, United States Attorney, Southern District of Florida, Charles R. Walsh, Trial Attorney, Criminal Division, and Luke Cass, Trial Attorney, Criminal Division, were on brief, for appellee.

March 6, 2017

**BARRON**, **Circuit Judge**.  In 2014, a jury convicted Jorge Rivera-Izquierdo ("Rivera") of two counts of money laundering, in violation of 18 U.S.C. §§ 1957 and 2.  He now appeals.  Finding no reversible error, we affirm.

**I.**

18 U.S.C. § 1957 makes it a felony to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."  18 U.S.C. § 1957(a) (emphasis added).  The statute goes on to define "criminally derived property" as follows: "any property constituting, or derived from, proceeds obtained from a criminal offense."  Id. § 1957(f)(2).

In 2010, a federal indictment charged Rivera with violating 18 U.S.C. § 1957 and 18 U.S.C. § 2, which punishes aiders and abettors as though they were principals.  According to the indictment, Rivera and several co-defendants, "aiding and abetting each other, did knowingly engage or attempt to engage in" two transactions to purchase cars with "criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

The indictment alleged that the two vehicle purchases occurred in September 2008 and May 2009, respectively.  The "specified unlawful activity" was a fraudulent scheme perpetrated

- 2 -

by Rosa Castrillon-Sanchez ("Castrillon"), the daughter of Rivera's common-law wife.[1]

According to the indictment, in September 2008, Rivera and Castrillon used "criminally derived" funds from Castrillon's fraudulent scheme to make a down payment of $20,000 for a 2008 Toyota Sequoia sport utility vehicle. In addition, several months later, Rivera again helped Castrillon purchase a sport utility vehicle -- this time, a BMW -- by making a "[p]ayment toward" the vehicle's purchase price of approximately $63,418 with funds in excess of $10,000 that were "criminally derived" from Castrillon's fraudulent scheme.

The indictment described Castrillon's fraudulent scheme as follows. Castrillon would tell her victims, most of whom were friends and family members, that a large sum of money -- for which she was the ostensible beneficiary -- had been "frozen" in a local bank. Castrillon would then request money to help "release" these "frozen" funds. The victims could not afford the large sums of money Castrillon requested. She thus would either complete fraudulent loan applications on behalf of her victims or instruct

---

[1] Subsection (f)(3) provides that the term "specified unlawful activity" is to be given the meaning that term has in 18 U.S.C. § 1956(c)(7). The parties do not dispute that Castrillon's scheme -- for which she was charged with violating 18 U.S.C. § 1028, the federal identity fraud statute, 18 U.S.C. § 1343, the federal wire fraud statute, and 18 U.S.C. § 1344, the federal bank fraud statute -- qualifies as specified unlawful activity under § 1957. See 18 U.S.C. §§ 1957(f)(3), 1956(c)(7), 1961.

them to take out loans themselves. Castrillon would then take the cash from those loans. All told, Castrillon defrauded her victims out of millions of dollars.

At trial, Rivera introduced evidence that Castrillon gambled extensively and that she used money taken from her gambling winnings -- rather than from the money that she had taken from the fraud victims -- to supply the funds that Rivera then used to make the car purchases. Rivera thus contended that, because the money that he used in buying the cars came from the gambling winnings, it was not "criminally derived property." Rivera also argued that he did not know that the funds that he received from Castrillon and that he then used in buying the cars constituted "criminally derived property," even if those funds somehow were so derived. Instead, he argued, he thought that the funds that Castrillon gave him were just funds that she took from her gambling winnings.

In response, the government sought to show at trial that the money from the gambling winnings actually did constitute "criminally derived property." The government did so by putting in evidence that Castrillon had used the money that she took from her fraud victims to fund her gambling. The government also put forward evidence to show that Rivera knew that Castrillon had done so.

After a month-long trial, the jury convicted Rivera of two counts of money laundering, in violation of 18 U.S.C. §§ 1957

- 4 -

and 2.  The jury acquitted him, however, of the two other counts that he faced: conspiracy to commit bank and wire fraud in violation of 18 U.S.C. § 1349, and wire fraud, in violation of 18 U.S.C. § 1343.

The District Court sentenced Rivera to 42 months of imprisonment.  On appeal, Rivera makes a number of challenges to his convictions.  We consider each one in turn.

## II.

We start with the challenge that is the primary focus of the parties: Rivera's contention that the District Court erred in instructing the jury regarding one part of § 1957.  We find that this challenge has no merit.

## A.

The District Court instructed the jury that, just as § 1957(f)(2) provides, the term "'criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense."  Rivera does not challenge this instruction.  He instead challenges the instruction that immediately followed, which purported to define the term "proceeds" in the statute's definition of "criminally derived property."

That instruction informed the jury that "proceeds" were: "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the

gross receipts of such activity."  Rivera points out that this instruction tracked, word for word, the definition of "proceeds" that Congress set forth in an amendment to § 1957, which became law in 2009 as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, 123 Stat. 1617.  Rivera contends that, under the Ex Post Facto Clause, this definition of "proceeds" could not lawfully have been applied to his case because the "specified unlawful activity" -- Castrillon's fraudulent scheme -- had begun years before FERA's passage.[2]

---

[2] Among other things, FERA defined "proceeds" in the companion money-laundering statute, 18 U.S.C. § 1956, to encompass "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."  18 U.S.C. § 1956(c)(9) (as amended).  FERA then also expressly provided that the term "proceeds" used in the definition of "criminally derived property" in § 1957 "shall have the meaning given ['proceeds'] in section 1956."  18 U.S.C. § 1957(f)(3) (as amended).  The definition of "criminally derived property" in subsection (f)(2) of § 1957, however, has not been modified since the statute's passage in 1986.  See Anti-Drug Abuse Act of 1986, Pub. L. 99-570, § 1352, 100 Stat. 3207.

We note that the simple insertion of the new, post-FERA, definition of "proceeds" from § 1956(c)(9) into § 1957(f)(2) appears to lead to a strange result: "The term 'criminally derived property' means any property constituting, or derived from, any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity, obtained from a criminal offense." Thus, we think Congress likely intended for the definition of "criminally derived property" in subsection (f)(2) to read something like the following: "the term 'criminally derived property' means any property constituting or derived from, proceeds, obtained from a criminal offense, including the gross receipts of such activity." See S. Rep. No. 111-10, at 8 (2009) (explaining that because Santos "mistakenly limited the term 'proceeds' to the 'profits' of a crime," FERA was designed to

Rivera goes on to argue that the instruction was more "expansive and elastic" than the pre-FERA definition of "proceeds" that the District Court should have used. To make this argument, Rivera first directs our attention to the companion money-laundering statute to § 1957, which is 18 U.S.C. § 1956.[3]

Prior to FERA's passage, Rivera notes, that statute -- like § 1957 -- did not define the word "proceeds." There was thus no reason to conclude that "proceeds" in § 1956 meant anything other than what that word meant in § 1957. This fact matters, Rivera argues, because, in 2008, in United States v. Santos, 553 U.S. 507 (2008), the Supreme Court narrowly construed the word

---

"amend the criminal money laundering statutes . . . to make clear that the proceeds of specified unlawful activity include the gross receipts of the illegal activity, not just the profits from the illegal activity"); see also 155 Cong. Rec. S4774-02 (daily ed. Apr. 28, 2009) (statement of Sen. Levin) ("[R]ecent court decisions have misdefined the term 'proceeds' from the money laundering statute to mean only the net receipts from unlawful activities . . . This act will fix these decisions and explicitly define 'proceeds' to include not only net but gross receipts from unlawful activities.").

[3] Prior to 2009, § 1956 provided:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-- (A) with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to . . . imprisonment for not more than twenty years.

Anti-Drug Abuse Act § 1352 (emphasis added).

- 7 -

"proceeds" in § 1956 and thus, according to Rivera, necessarily also set forth the same narrow construction of that word in § 1957.[4]

Specifically, according to Rivera, Santos made clear that "proceeds" meant only the net receipts (or, put otherwise, the profits) of specified unlawful activity and not the gross receipts of that activity. Rivera also contends that Santos made clear that, in any event, "proceeds" (whether gross or net) never means "more than the receipts from the specified criminal activity."[5]

---

[4] In Santos, the Court considered whether the expenses of operating the defendant's "illegal lottery" -- including "payments to runners, winners, and collectors" -- constituted "proceeds" under 8 U.S.C. § 1956. 553 U.S. at 510. A four-justice plurality concluded that they did not. Because, on the plurality's view, the meaning of the term "proceeds" was ambiguous, the plurality applied the rule of lenity to hold that the term "proceeds" means the "net profits" of criminal activity, and thus did not encompass the illegal lottery's expenses. Id. at 514. Concurring in the judgment, Justice Stevens declined to adopt a categorical definition, instead suggesting that the "Court need not pick a single definition of 'proceeds' applicable to every unlawful activity." Id. at 525. Like the plurality, however, Justice Stevens was concerned that applying a "gross receipts" definition to the specific facts of Santos would lead to the so-called "merger" problem," whereby the defendant would be convicted of the substantive offense of "operating a gambling business," and then convicted again, under § 1956, of money laundering for "the mere payment of the expense of operating an illegal gambling business." Id. at 527. This possibility, Justice Stevens noted, was "in practical effect tantamount to double jeopardy." Id. Applying the rule of Marks v. United States, 430 U.S. 188 (1977), we held in United States v. Adorno-Molina, 774 F.3d 116, 123 (1st Cir. 2014), that "Justice Stevens's concurrence is the controlling law."

[5] Although Castrillon's fraud began several years before Santos was decided, Rivera does not contend that the definition of

- 8 -

From this premise, Rivera contends that the District Court's instruction, by relying on FERA's later-enacted definition of "proceeds," expanded the scope that Santos had given to that term in § 1956 in two key respects. Unlike the definition of "proceeds" set forth in Santos, Rivera points out, the instruction -- tracking FERA -- expressly stated both that "proceeds" includes "gross receipts" and that "proceeds" includes: "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity." 18 U.S.C. § 1956(c)(9) (as amended) (emphasis added).

In pressing this challenge, Rivera emphasizes that the government first proposed this instruction as to the meaning of "proceeds" only after Castrillon had testified for the defense about her gambling activity. During that testimony, Rivera notes, Castrillon stated that the money that she gave to Rivera to purchase the cars came from her gambling winnings. Rivera contends that the government proposed the FERA-based instruction defining "proceeds" in order to argue to the jury that it was "simply irrelevant whether the money" used to buy the cars was "gambling winnings or fraud proceeds because Rivera was guilty either way." As a result, he argues, the instructional error "went to the very heart of the case." It impermissibly enabled the jury, Rivera

the term should be anything other than one that he contends that Santos provided.

- 9 -

contends, to find that Castrillon's gambling winnings constituted the "proceeds" of "specified unlawful activity," even though those winnings were not the actual funds taken from Castrillon's fraud victims and thus were not (in Rivera's view) the "proceeds" of that fraud under Santos.

**B.**

Rivera concedes that he did not object at trial to the jury instruction that he now challenges on appeal. Our review, therefore, is only for plain error.

Under this standard, Rivera "faces the 'heavy burden of showing (1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Prieto, 812 F.3d 6, 17 (1st Cir. 2016) (quoting United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008)). Assuming a clear or obvious instructional error, Rivera need not, under the third prong of the plain-error review standard, "prove by a preponderance of the evidence that but for [the] error things would have been different." United States v. Rodríguez, 735 F.3d 1, 11-12 (1st Cir. 2013) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 84 n.9 (2004) (insertion in original)). But, a showing of "mere possibilities [is] not enough" to prove that an instructional error affected a defendant's substantial rights.

- 10 -

United States v. Procopio, 88 F.3d 21, 31 (1st Cir. 1996).  Rivera thus must show that the "outcome of the case would likely have changed" had the erroneous instruction not been given.  United States v. Colon, 744 F.3d 752, 758 (1st Cir. 2014).

The government disputes whether Rivera is right that the District Court erred in basing the "proceeds" instruction on the definition of the term that FERA set forth, given when FERA became law.  The government also disputes whether he is right about how narrowly Santos construed "proceeds."  Cf. Santos, 553 U.S. at 525 (Stevens, J., concurring in judgment).  But even if Rivera is right on both counts, his challenge to the instruction still fails because he cannot show that the instruction likely affected the outcome of the case.

The record makes clear that the part of the instruction that defined "proceeds" to include "gross receipts" did not likely affect the outcome of the case.  The record shows that Castrillon's fraud entailed little in the way of expenses.  The record also shows that the gross receipts from the fraud were extremely large -- totaling more than $2.5 million.  The expenses of the fraud, therefore, were simply too paltry for the instruction's definition of "proceeds" to include "gross receipts" to have made any difference.  Nor does Rivera point to anything in the record to suggest otherwise.

The record similarly shows that the part of the instruction that defined "proceeds" by using what Rivera calls "expansive and elastic" words -- "any property derived from or obtained or retained, directly or indirectly" -- did not likely affect the outcome of the case. (emphasis added). As we have noted, the instructions as a whole made clear that, consistent with § 1957(f)(2), property "derived from" the "proceeds" of specified unlawfully activity is itself "criminally derived property." United States v. Brown, 669 F.3d 10, 29 (1st Cir. 2012) ("When applying the plain error standard in the context of jury instructions, 'we look at the instructions as a whole to ascertain the extent to which they adequately explain the law without confusing or misleading the jury.'" (quoting United States v. Troy, 618 F.3d 27, 33 (1st Cir. 2010))).

Thus, the government did not need to prove that Castrillon's gambling winnings themselves constituted the "proceeds" of her fraud. To make the case that Rivera, in using money taken from those winnings to buy the cars, used "criminally derived property," the government needed to prove only that the money that he used from the gambling winnings constituted property "derived from" the fraud's "proceeds."

This feature of the definition of "criminally derived property" dooms Rivera's challenge to the instruction. As we explain more fully in addressing Rivera's separate challenge to

the sufficiency of the evidence, the record provides ample support for a jury to find that Castrillon generated her gambling winnings exclusively from the funds that she took from the fraud (or, put otherwise, from the "proceeds" of it).  The record also provides ample support for a jury to find that the fraudulently obtained funds that Castrillon used to generate the gambling winnings totaled at least as much as the amount of money that Castrillon then gave to Rivera to buy the cars.  Given the strength of the evidence that Castrillon's gambling winnings were "derived from" the proceeds of Castrillon's fraud -- and thus that the proceeds were "criminally derived" -- Rivera fails to show that the outcome of the case would likely have changed had the challenged instruction on "proceeds" not been given.[6]

---

[6] A number of sister circuits, pre-FERA, had construed the "derived from" portion of the statute's definition of "criminally derived property" expansively in analogous circumstances.  And they did so to account for the practical reality that "[m]oney is fungible," and thus that "when funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset, the illicitly-acquired funds and the legitimately-acquired funds (or the respective portions of the property purchased with each) cannot be distinguished from each other." United States v. Moore, 27 F.3d 969, 976-77 (4th Cir. 1994); see also id. (concluding that, where the defendant obtained the "overwhelming bulk of the purchase money" for several condominiums from his bank fraud, "the jury was entitled to conclude . . . that when the condominiums were eventually sold, the net proceeds of that sale were in their entirety property derived from . . . [the defendant's] bank fraud" (emphasis added)); United States v. Johnson, 971 F.2d 562, 570 (10th Cir. 1992) ("An examination of the defendant's bank records gave no indication that the funds in the defendant's account came from any source other than investors in the alleged [fraud scheme].  Under the circumstances, the

Rivera, moreover, makes no developed argument to the contrary. He instead focuses solely on how the jury instruction's "expansive and elastic" language defining "proceeds" permitted the jury to find that the gambling winnings were "proceeds." But, as we have just explained, that focus is too limited, given how § 1957 defines "criminally derived property." See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").[7]

---

evidence was sufficient for the jury to find that the funds withdrawn were derived from the specified unlawful activity." (emphasis added); cf. United States v. Davis, 226 F.3d 346, 357 (5th Cir. 2000) ("[W]hen the aggregate amount withdrawn from an account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account.").

[7] We thus have no need to address whether the instruction would have been prejudicial if we were, like Rivera, to focus only on the meaning of "proceeds." We do note that it is not at all clear that it was. Rivera does contend that Santos makes clear that the funds used to purchase cars, insofar as they are from gambling winnings, would not qualify as "proceeds" even if they would qualify under FERA's more expansive definition. But Santos considered only whether the "proceeds" of the defendant's illegal lottery referred to the "receipts" of that lottery, or its "profits." 553 U.S. at 511 (Scalia, J., plurality opinion). Thus, Santos did not address how tight the connection between a transaction charged under § 1957 and some specified unlawful activity must be in order for the funds used to make the transaction to "constitute" the "proceeds" of that activity. See 18 U.S.C. § 1957(f)(2). Moreover, some courts, pre-FERA, indicated that "proceeds" was even then an expansive term. See Moore, 27 F.3d at 976-77 ("[W]hen funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset . . . it may be presumed . . . that the transacted funds, at least up to the full amount originally derived from crime, were the

- 14 -

Accordingly, we conclude that Rivera's challenge to the jury instruction concerning the definition of the term "proceeds" in § 1957 fails.  For even if the instruction was given in error, Rivera has not shown how that error affected his substantial rights.

## III.

We turn, then, to Rivera's contention that the evidence was insufficient.  Our review is de novo.  United States v. Maymí-Maysonet, 812 F.3d 233, 236 (1st Cir. 2016).  In undertaking that review, we consider "the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime."  Id. (quoting United States v. Cruz-Rodriguez, 541 F.3d 19, 26 (1st Cir. 2008)).  Applying these standards, we reject Rivera's sufficiency challenge, which, as we will explain, has two distinct aspects.

---

proceeds of the criminal activity or derived from that activity." (emphasis added)); see also United States v. Sokolow, 91 F.3d 396, 409 (3d Cir. 1996) ("It is clear from the full context of the district judge's explanation of the concept of proceeds that he is addressing the absence of a legal requirement that the government trace the funds constituting criminal proceeds when they are commingled with funds obtained from legitimate sources.  We find no error in the district court's jury instructions in this regard." (emphasis added) (internal citation omitted)).

**A.**

First, Rivera argues that the government presented insufficient evidence to prove beyond a reasonable doubt that the money that he used to purchase the two vehicles was "criminally derived property." But, we do not agree. See United States v. Rodríguez-Durán, 507 F.3d 749, 758 (1st Cir. 2007) (explaining that on sufficiency review the "government need not succeed in eliminating every possibly theory consistent with the defendant's innocence" (internal quotation marks and citation omitted)).

The government adduced a wealth of evidence that showed that Castrillon generated the gambling winnings by using fraudulent funds in an amount far greater than the amount that she testified that she gave to Rivera to make each car purchase. Specifically, Castrillon testified that she obtained more than $2.5 million from the victims of her fraud, which began in 2005. Moreover, Castrillon testified that she "began [her gambling] addiction, it was for five years, 2006 [or] 2005"; that, as of 2007, her income from her prior employment had come to an end; and that, over time, she suffered gambling losses of "much more" than half a million dollars.

A jury could thus reasonably infer that the source of the money that Castrillon used to generate the gambling winnings was exclusively the money that Castrillon took from the "proceeds" of the fraud. A jury could also reasonably infer that the amount

- 16 -

of fraudulently obtained funds she used to fund her gambling totaled at least as much as the amount of money that she gave to Rivera to buy the cars. And, for the reasons that we have just explained regarding the scope of the "derived from" prong of § 1957's definition of "criminally derived property," a jury that could reasonably make those inferences also could reasonably find the following. Insofar as Rivera used the gambling winnings to make each car purchase that is at issue here, he each time used "criminally derived property" in excess of $10,000 from "specified unlawful activity" to do so.

To make the contrary case, Rivera advances a number of arguments about the state of the record. But we do not find them to be persuasive.

Rivera first contends that it is possible that Castrillon made money from gambling before the fraud began in 2005. He thus argues that a jury reasonably could have found that Rivera made the car purchases with funds taken from these pre-fraud, untainted gambling winnings. But, Rivera identifies no plausible source -- nor do we find one in the record -- for Castrillon's hypothetically untainted gambling winnings, let alone evidence that such untainted winnings were of a size sufficient to supply more than $10,000 towards a car purchase not once, but twice.

To the contrary, by her own testimony, Castrillon began gambling "in 2006, [or] 2005," and she did not testify that the

- 17 -

gambling preceded the fraud. Nor did she at any point testify that her pre-fraud gambling luck (if any she had) generated amounts of any significance. In fact, Castrillon made clear that she used the fraudulently obtained funds to feed her casino gambling in the down periods, which she also testified were frequent enough (or unlucky enough) that Castrillon's gambling losses at a San Juan hotel's casino well exceeded half a million dollars.

Rivera next notes that, at one point during her testimony, Castrillon stated that the funds that Rivera used to buy the BMW came from money that she made off of the "electronic lottery." And, Rivera contends, a jury reasonably could find that the lottery winnings were not tainted by the fraud.

Rivera never identifies evidence in the record, however, that reveals an untainted source of the funds that Castrillon might have tapped to play the electronic lottery. Nor did Castrillon herself identify one. Rather, Castrillon, as we have just noted, testified that she had no source of income from her prior employment after 2007 and that she had casino gambling losses in excess of $500,000. She also agreed during her testimony at trial that the "money [she] would gamble with . . . was from" her fraud victims, which funds totaled more than $2.5 million.[8]

_____

[8] The full colloquy surrounding that statement during Castrillon's cross-examination by the government reads as follows:

- 18 -

Finally, Rivera points to the gap in time between late October 2008, when Castrillon received the last of the funds she took directly from the fraudulent scheme, and May 2009, when the second vehicle was purchased. But Rivera identifies no plausible separate source of funds -- that is, funds that were not "derived from" the "proceeds" of the fraud scheme -- with which Castrillon might have gambled after the scheme ended and from which the funds used to pay for the cars could have come. We thus do not see how this gap helps Rivera's argument.

That leaves only the circuit precedents that Rivera relies upon. But, given the evidence in the record, these cases are readily distinguished.

---

A: Are you asking me, sir, if the money that I used to pay for the [Toyota Sequoia], I never thought about paying it back to other people?
Q: That's pretty obvious; isn't it?
A: The answer to that is no.
Q: And you testified that -- in direct, that that money was from casino winnings?
A: Yes, there was evidence to that effect and I had to present it. Not the casino, it was the electronic lottery.
Q: The money you would gamble with, as you testified before, was from the individuals who were loaning you money?
A: And the money that I would also, at the same time, win at the machines.

In answering the prosecutor's question, Castrillon clearly did not distinguish between casino gambling and the electronic lottery, thus suggesting she also used fraudulently derived funds to play the lottery.

The first precedent Rivera relies on is our decision in United States v. Carucci, 364 F.3d 339 (1st Cir. 2004). There, the government sought to prove that the defendant was guilty of violating § 1957 because he had laundered funds derived from the criminal activities of Stephen Flemmi, "the notorious leader of Boston's 'Winter Hill Gang.'" Id. at 340. We explained that, in light of the record, "[a]ccepting that Flemmi's income was illegitimate, it could have been linked to any number of criminal activities . . . [and thus] there [was] no . . . evidence that Flemmi had engaged in the specified [unlawful activities charged in the indictment] in the relevant time period." Id. at 347.

Rivera's case is very different. The record here does not reveal plausible sources for the money that Rivera used to help Castrillon buy the two cars other than the gambling winnings that the record sufficiently shows were "derived from" the proceeds of her fraud. Instead, the evidence offers no plausible untainted source form which the gambling winnings were made.

Similarly off-point is United States v. Wright, 651 F.3d 764 (7th Cir. 2011). There, the Seventh Circuit held that the government failed to prove a violation of § 1957 because the defendant used only $8,000 in "drug proceeds" -- an amount below the statute's $10,000 threshold for the amount that must be involved in a transaction charged under § 1957 -- to purchase a property that the defendant later sold for approximately $50,000.

Id. at 771.  In Rivera's case, however, the government did not rely on the value of the assets purchased (the cars) to get over the statutorily imposed $10,000-per-transaction threshold for "criminally derived property."  The government instead relied on extensive evidence that showed the following.  The gambling winnings came exclusively from the funds that Castrillon took from her fraud.  And, the fraudulently obtained funds that she used to gamble totaled well in excess of the amount of money that would have been needed to cover the money that Rivera got from Castrillon to buy the cars, which exceeded $10,000 per transaction.

For related reasons, United States v. Rutgard, 116 F.3d 1270 (9th Cir. 1997), is also no help to Rivera.  There, the Ninth Circuit held that money derived from funds that were not "criminally derived property" and that were sufficient to pay for a transaction in excess of $10,000 does not become "criminally derived" just because the clean funds are commingled in an account that also contains "criminally derived property."  Id. at 1292; see also Saccoccia v. United States, 42 Fed. Appx. 476, 481 (1st Cir. 2002).  But here, the record overwhelmingly indicates that only funds that were, at the least, "derived from" the proceeds of the fraud were used to give Rivera the funds that he used to buy the cars.  Thus, the circumstance Rutgard addressed is not presented here.

**B.**

The other aspect of Rivera's sufficiency challenge concerns the evidence of his mens rea. He argues that the government presented insufficient evidence to prove that he "knew that more than $10,000 of criminal money was involved" in the second vehicle purchase. (emphasis added). He bases this contention on Castrillon's testimony that she told him that "the money for the car was gambling winnings."

The record, however, reveals evidence of Rivera's close ties to Castrillon -- including her testimony that it was "[a]s if he was" her father. Rivera also concedes that the government presented wide-ranging evidence of Rivera's participation in the fraud scheme, including evidence that he recruited new victims, pressured them to take out loans, assured them the frozen funds at the heart of the scheme were real, and threatened victims who came to complain to Castrillon's mother.

Thus, a jury could reasonably infer that Rivera knew that Castrillon had no source of revenue for her gambling activity other than the fraudulently obtained funds and that he knew that the fraudulent scheme was extremely profitable -- generating, per Castrillon's testimony, over $2.5 million. And a jury that could reasonably make this inference could also reasonably infer that Rivera knew that money obtained from that scheme funded Castrillon's gambling and, consequently, that the funds she took

from her gambling activity to give to him to make the two car purchases was "criminally derived."  This part of his sufficiency challenge, therefore, fails as well.  See United States v. Richard, 234 F.3d 763, 769 (1st Cir. 2000) ("[T]he government must prove . . . that [the defendant] had general knowledge of the subject property's criminal nature . . . .").

**IV.**

Having dispensed with Rivera's challenges to the jury instructions and to the sufficiency of the evidence, we now address the two remaining challenges that Rivera makes that concern the tie between Castrillon's gambling winnings and her fraud.  Neither challenge has merit.

**A.**

Rivera contends first that his convictions must be reversed because of statements that the prosecutor made in his closing argument.  In those statements, the prosecutor told the jury that it could convict Rivera if the money used to buy the vehicles "came from casino winnings and not directly from victims" because that money was nevertheless "criminally derived property." Rivera contends that these statements amounted to an erroneous assertion that the jury was legally required to apply a "presumption that all of Castrillon's money was dirty."

Rivera concedes that he did not object to the prosecutor's statements at trial.  Our review, therefore, is for

- 23 -

plain error.  United States v. González-Pérez, 778 F.3d 3, 20 (1st Cir. 2015).  We find none.  As we read the record, the prosecutor did not argue that a legal presumption of taint applied to all the funds that were used to purchase the cars.  The prosecutor merely summarized his view of what had been revealed by the circumstantial evidence presented at trial about the nature of the funds used to make those transactions.[9]  Moreover, the District Court instructed the jury that "the closing arguments are not evidence."  For these reasons, the prosecutor's statements supply no basis for sustaining Rivera's challenge.  United States v. Allen, 469 F.3d 11, 16 (1st Cir. 2006) (noting that even a mischaracterization of the defendant's testimony, provided it was "unintentional and isolated" and corrected by a cautionary instruction by the district court, "did not prejudice the outcome of the case" and therefore did not constitute plain error).

---

[9] To the extent Rivera argues that the prosecutor "misstated Castrillon's testimony," we reject that challenge as well.  As Rivera correctly notes, "Castrillon testified that her gambling money came from either gambling winnings or loans."  Thus, the prosecutor did not err in suggesting to the jury that even if the money Rivera used to obtain the two manager's checks used to purchase the BMW "came from casino winnings and not directly from victims," it was nevertheless "criminally derived property because the money she was playing with was the victims' money."  Significantly, the government never stated that the funds in question were "proceeds."

**B.**

Rivera also argues that his convictions must be overturned because the District Court did not permit his attorney to adduce evidence quantifying Castrillon's gambling winnings. Rivera did preserve this challenge, and so our review is for abuse of discretion. United States v. DeCologero, 530 F.3d 36, 58 (1st Cir. 2008).

The record does not show that the District Court barred Rivera from presenting this evidence. Rather, after Rivera's attorney, on re-direct, withdrew a question in which he sought to quantify Castrillon's gambling winnings, the District Court emphasized that Rivera's attorney could pursue this line of questioning if he could "show the relevance and accuracy of that information."

Moreover, the additional evidence at issue could not have helped Rivera identify a plausible untainted source for the funds used to buy the cars. Much evidence was adduced at trial about the size of Castrillon's fraud and her lack of independent sources of income. In fact, during his direct examination of Castrillon, Rivera's attorney withdrew without objection his question about "[h]ow much money [Castrillon] would win" while gambling when the District Court told him that such testimony was needlessly cumulative. Thus, there was no abuse of discretion by the District Court.

**V.**

We now take up Rivera's three remaining challenges.  None supports the reversal of his convictions.

**A.**

Rivera first contends that the prosecutor acted improperly by asking Castrillon "whether four other trial witnesses were lying."  Because Rivera did not raise this challenge below, our review is for plain error.

The government does not dispute that the prosecutor's error in this regard was clear and obvious.  See United States v. Thiongo, 344 F.3d 55, 61 (1st Cir. 2003) (noting that "it is improper for an attorney to ask a witness whether another witness lied on the stand").  In order "to constitute plain error," however, the prosecutor's improper questions "must potentially have affected the outcome of the district court proceedings." United States v. Fernandez, 145 F.3d 59, 63 (1st Cir. 1998) (quoting United States v. Olano, 507 U.S. 725, 734 (1993)).  We see no basis for concluding that they did.

Rivera first points to the government's question about whether the "salesperson" who testified that Rivera was present when the Toyota Sequoia was purchased "was lying."  But the jury heard testimony -- and was presented extensive accompanying documentary evidence -- that Rivera purchased the Toyota Sequoia on Castrillon's behalf.  We thus do not see how the comment by the

prosecutor that is at issue -- even if improper -- was sufficiently prejudicial to warrant overturning the verdict. See id. at 65 ("Given the strength of the government's case, it stretches credulity to believe that the improper framing of these un-objected-to questions affected the outcome of the trial.").

Rivera also fails to show the requisite prejudice from the three other instances that he identifies in which the prosecutor asked Castrillon whether other witnesses were lying.[10] The government put forth considerable evidence of Rivera's participation in the two vehicle purchases, his closeness to Castrillon and, as Rivera himself concedes, his knowledge of and participation in the fraud scheme itself. Thus, "[w]e see no way that these few miscast questions could have so tainted the trial as to affect its outcome." Id. at 64; see also United States v. Pereira, __ F.3d __, 2017 WL 462104, at *12-*13 (1st Cir. Feb. 3, 2017) (noting a lack of prejudice to the defendant, and thus no plain error, where the questions "were limited in number and scope, and only pertained to tangential, corroborated testimony").

---

[10] Those three instances are the following. At one point during the government's cross-examination of Castrillon, the prosecutor took issue with statements suggesting Rivera was not involved in alerting her to the apparent distress of two victims of the fraud scheme, Fidel Lozada Gutierrez and Edgardo Vidal. At another, the prosecutor disputed Castrillon's account of how Rivera learned that a different victim of Castrillon's scheme, William Sanchez, had loaned her money. At a third point, the prosecutor challenged Castrillon's testimony concerning how much money yet another victim, Roberto Ortiz, had loaned Castrillon.

Rivera next argues that the District Court erred in granting the government's motion in limine to exclude evidence that concerned the negligence or lack of due diligence of Castrillon's victims. Rivera contends that the District Court's ruling limited his ability "to demonstrate just how successful Castrillon was in duping people, thereby making it more likely that Rivera himself was duped." Our review is for abuse of discretion. DeCologero, 530 F.3d at 58.

As the government correctly points out, the District Court permitted Rivera to argue to the jury that he was a victim of Castrillon's manipulation and to present evidence in support of that argument. Thus, we do not see how the District Court erred. It merely excluded evidence that would have been at best cumulative (and, at worst inconsistent with) a side point that Rivera wished to make but that was not even in dispute: that Castrillon was a skilled fraudster. Thus, there was no abuse of discretion.

**C.**

Finally, we reject Rivera's claim of cumulative error. The record contains strong evidence that the gambling winnings Rivera used to buy the cars were, at the least, "derived from" the "proceeds" of Castrillon's fraud. The errors that Rivera alleges, however, are not responsible for the jury having heard that evidence. We thus conclude that the errors Rivera points to, if

- 28 -

any there were, "in the aggregate, do not come close to achieving the critical mass necessary to cast a shadow upon the integrity of the verdict."  United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993).

## VI.

For these reasons, we **affirm** Rivera's convictions.