UNITED STATES of America, Appellee,

v.

**Jose Luis LEBRON–GONZALEZ, A/K/A Tito Camaro, A/K/A Tito Pulgar, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Raymond CATALA FONFRIAS, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Ernesto Gil ARZOLA MARTINEZ, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Eduardo RODRIGUEZ PARRILLA, Defendant, Appellant.**

**Nos. 85–1681 to 85–1684.**

United States Court of Appeals, First Circuit.

Argued Feb. 2, 1987.

Decided April 24, 1987.

See also, D.C., 612 F.Supp. 999, D.C., 610 F.Supp. 574.

Seth M. Kalberg, Jr., Boston, Mass., by appointment of the Court, for appellant Jose Luis Lebron-Gonzales.

Mariam Ramos-Grateroles, Bayamon, P.R., by appointment of the Court, for appellant Raymond Catala Fonfrias.

Terrance J. McCarthy, Braintree, Mass., by appointment of the Court, for appellant Ernesto Gil Aizola Martinez.

Douglas M. Brooks, Boston, Mass., by appointment of the Court, for appellant Eduardo Rodriguez Parrilla.

John T. Bannon, Jr., Washington, D.C., with whom Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before COFFIN, Circuit Judge, WISDOM,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

COFFIN, Circuit Judge.

These are appeals by four co-defendants, Raymond Catala Fonfrias (Catala), Ernesto Gil Arzola Martinez (Arzola), Jose Luis Lebron-Gonzalez (Lebron), and Eduardo Rodriguez Parrilla (Rodriguez), from judgments of conviction, following jury trials,[1] arising out of the murder of one Griselle Gonzalez-Ortiz (Jessica). The federal statutes found to have been violated in all cases were the criminal civil rights conspiracy and substantive offense statutes, 18 U.S.C. §§ 241 and 242.[2] Lebron, Catala and Arzola were each sentenced to concurrent life sentences, Rodriguez to concurrent terms of imprisonment of fifty years. After considering a large number of asserted errors, mainly having to do with the conduct of the trial, we affirm.

---

* Of the Fifth Circuit, sitting by designation.

1. Two juries were impaneled and simultaneously heard most of the government's evidence on all cases. Jury I decided the case involving Catala and heard some taped conversations between Ortiz and Catala not heard by Jury II; Jury II decided the cases involving the other three defendants.

2. The relevant provisions of the two statutes are as follows:

§ 241. **Conspiracy against rights of citizens**
If two or more persons conspire to injure ... any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same....

\* \* \* \* \* \*

... [If] death results they shall be subject to imprisonment for any term of years or for life.

§ 242. **Deprivation of rights under color of law**
Whoever, under color of any law ... willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ... if death results shall be subject to imprisonment for any term of years or for life.

The scenario portrayed is one of unrelieved venality. We need only sketch the highlights here, since the legal issues chiefly concern very specific rulings and their own special factual background. Appellant Lebron had been charged with the murder of one Rivera de Leon in March of 1979. Jessica had witnessed the shooting, had testified at the preliminary hearing, and in late May was attending court, waiting to testify as the only witness for the prosecution. Meanwhile, after Jessica's testimony at the preliminary hearing, Lebron and his attorney Catala hired for $15,000 the services of an investigator in the Police Department, Arzola, and his superior, the Director of the Property Crime Section, Ortiz-Ortiz (Ortiz), to prevent Jessica from testifying. Rodriguez was an associate of Lebron. Ortiz subsequently pleaded guilty and cooperated with the authorities, his testimony being the principal source of the events here revealed.

Conversations subsequently took place among Ortiz and all the appellants; the means of preventing the testimony soon became the killing of Jessica; and partial payments of some $4,000 were made to the two police officers. On May 29, 1980, Ortiz had Jessica brought to his office at police headquarters and then to the courthouse. After the court session, Ortiz, purporting to drive Jessica to her home in Arecibo, rendezvoused with Arzola, discussed, in Jessica's absence, the weapon to be used, proceeded to a number of bars, and then drove on a dark road near an abandoned sugar plantation. Arzola, sitting in the left back seat, then shot Jessica, who was sitting in the front passenger's seat. They left the body under a tree. Two days later, Ortiz and all appellants met again, where Ortiz and Arzola were congratulated by the others and sought to up their ante to $22,000.

The four appellants have advanced some fifteen alleged reversible errors. We deem roughly half of these sufficiently substantial to merit discussion in some detail. The remainder we shall dispose of more summarily. We begin with the former group— the challenges of all appellants to the admission into evidence of a birth certificate, purportedly that of the victim; to the admission of certain testimony of an expert witness; and to several aspects of the court's instructions dealing with elements of the crimes covered by 18 U.S.C. §§ 241 and 242. All of our discussion, of course, deals with the evidence and inferences in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

### Admission of the birth certificate; sufficiency of proof of United States citizenship

Successful prosecution of a violation of 18 U.S.C. § 241 requires adequate proof that the victim was a citizen of the United States. In this case a bizarre turn of events converted what should have been the simplest of tasks into an issue provoking considerable argument by all appellants. The government's plan was simply to put Jessica's foster mother, Tomaso Borrero Ortiz, on the stand to testify that Jessica had been born in Puerto Rico. This was not to be. The foster mother had assiduously, on her own volition, attended court every day during the selection of the jury. During the voir dire of juror number 7, she broke into sobs and was removed from the courtroom. Shortly after, her voice could be heard from a nearby hall crying "she is dead" several times. A motion for mistrial was made and denied. An impasse developed when the defense refused to stipulate that the foster mother would have testified to the Puerto Rican birth (and, thus, citizenship) of Jessica and when the court, concerned about the prejudicial impact of any in-court emotional display, refused to allow the foster mother to testify.

The government then proceeded to offer a document purporting to be a certified copy of Jessica's birth certificate, bearing, however, the name, "Grisette Ivette Gonzalez" (not Griselle Gonzalez-Ortiz). The record as to the grounds of objection is barren. All that it reveals is that the court referred to some apparently unrecorded previous discussion and assured counsel that their objection was noted. Nor have

appellants made any effort either to have the record corrected to reflect what was not transcribed or to tell us what grounds, if any, were asserted. We note that the burden of seeing that a record is adequate to present issues on appeal rests on appellants. *Muniz Ramirez v. Puerto Rico Fire Services,* 757 F.2d 1357, 1358 (1st Cir.1985); Loc.R. 11.

The court then announced that it was taking judicial notice based on the birth certificate that Jessica was a U.S. citizen.[3] Such action, however, would not seem to fall within the contours of Fed.R.Evid. 201 (fact not subject to reasonable dispute in that it is generally known in the district or capable of determination by resort to unquestionable sources). No objections were noted to this ruling.

On appeal two grounds are asserted: the lack of any proof that the "Grisette" on the certificate was the same person as "Griselle" the victim; and the failure of the certificate, having been belatedly (more than 10 days after birth) executed, to meet a number of requirements of P.R. Laws Ann. tit. 24, § 1131—principally a sworn statement from a parent and information about the mother—which are prerequisite to a copy from the record of the Vital Statistics Registry being received as prima facie evidence.

■ In sum, we have a document admitted over unspecified objection, the court improperly basing the ruling on judicial notice, this ruling not being objected to, with various other possible grounds never having been mentioned by the parties or the court. If the admission of the certificate is to be judged by plain error, we see no possibility of defendants' substantial rights being affected. Even if objection to the ruling is preserved, we find any error harmless by reason of the fact that all of the evidence points to Jessica's continuous residence in Puerto Rico, a sufficient predicate for citizenship.

This evidence is the following. The jury had before it testimony of two police offi-cer witnesses, Lugo and Ortiz, that Jessica, at the time of her murder, was living in Arecibo in a housing project. In addition, Jessica herself testified at the December, 1979, preliminary hearing that, as of March 12, 1979, she was residing in Puerto Rico (at 711 14th St., Bo. Obrero—a barrio or section of San Juan); that she went to the United States at age 12 and returned to Puerto Rico when she was 15—five years before she gave her testimony; and that at the time of the hearing she was living in Aibonito, Puerto Rico. To this we could add the perhaps less weighty facts that Jessica's name was consistent with Puerto Rican nomenclature and that her foster mother, an aunt, and an uncle also lived in Puerto Rico. All of these facts clearly indicate residence for most of her life in Puerto Rico, which, suffices to support a reasonable inference that she was a citizen of the United States. *United States v. Nathan,* 238 F.2d 401, 409 (7th Cir.1956), *Hoffman v. United States,* 68 F.2d 101, 103 (10th Cir.1933). Indeed, this is the only inference generated by the evidence.

### Admission of Dr. Criado's testimony

Appellants challenge the allowance of certain testimony of Dr. Rafael Criado, a forensic pathologist, because (a) a hypothetical question assumed facts which were not supported by the record and (b) he was testifying beyond the field in which he was an expert. Dr. Criado had earlier testified to the angles of entry and exit of the two bullets which had entered the victim's head, one in front of the left ear, the other at the left side of the back of the neck. He had said they had taken a downward, left to right course and had exited at the right side of the mouth and the right-hand portion of the front of the neck. The prosecution then wished Dr. Criado to demonstrate with a mannequin and chairs from what direction, in his opinion, the shots had come; it was the prosecution's theory that the gun had been fired by appellant Arzola from the rear seat, rather than by the

**3.** Notwithstanding this taking of judicial notice, the court left it to the jury in its instructions to find whether the third element of Count 1, citizenship, had been proven. This, of course, is in accord with the mandate of Fed.R.Evid. 201(g).

driver of the car, the government's chief witness, Ortiz.

After the defense had urged the doctor to use a lectern or back of a chair to represent the car door which had received an impact from, presumably, a bullet, to better illustrate where the point of impact was, the witness stated, "I'm only a forensic pathologist and not a police investigator or expert ... and I cannot determine exactly how it was that it occurred." Whereupon defense counsel vociferously objected. Ultimately, after much ado, Dr. Criado, explained that, as a forensic pathologist, he keeps in mind "the direction of the bullet in regard to the anatomical position of the body [upright and facing front]" which he had earlier described and was allowed to testify that the shots more probably than not came from the back, from a left to right position, rather than from the front seat.

■ A close reading of the record convinces us that there was less to these objections than meets the eye. As for the first objection, appellants argue that there was no evidence that Jessica was positioned as Dr. Criado assumed. Ortiz, however, had testified that, a minute or so after leaving the last bar, Arzola, sitting in the rear seat behind the driver, shot Jessica, her body going right and forward. From this testimony and the evidence regarding the entry and exit wounds, it seems to us that the jury—and Dr. Criado—could infer that Jessica was indeed seated in an upright, facing forward position. She could not have been facing left, or she would likely have had Arzola within her vision. Also, the location of the bullet wounds would not be consistent with the hypothesis that she was facing left at the time of the shooting. She could not have been facing right either, again because the location of the bullet wounds and the testimony regarding the movement of her body would not support this assumption. Finally, she probably was not bending forward, or else she would have had very little room to go forward when shot. We recognize that there may be other possibilities, but from our review of the evidence we believe the Dr. Criado's assumption regarding Jessica's body position was adequately supported by the record.

■ As for the challenge to Dr. Criado's expertise, it seems clear to us that the witness's protestation of lack of expertise and defendants' concern that the witness was not a ballistics expert had to do with something quite different from what the government wished to elicit. The demonstration was devised to accompany and illustrate Dr. Criado's bottom line testimony that the shots had probably come from the rear. It was only when defense counsel urged that a lectern or chair back be added to the scenario to better show the point where one of the bullets struck the door that Dr. Criado spoke about his lack of expertise. One defense counsel said that a ballistics expert was needed to know how a bullet could be deflected after hitting a vertebra; another assumed the witness would try to reason back from the point and angle of impact on the door to the point of origin. Neither line of testimony was contemplated. Notwithstanding this, appellants on appeal have foregone any mention of the door and have asserted for the first time that a forensic pathologist could not give his opinion as to the general direction from which the bullets had come. This is of course one of those evidentiary decisions committed to the discretion of the trial judge. There was no abuse of discretion.

### Adequacy of instructions as to 18 U.S.C. § 241 (Count 1)

Appellants level two criticisms against the court's instructions under Count 1 and 18 U.S.C. § 241 (conspiracy to deprive a United States citizen of a right secured by the laws or Constitution of the United States). The first, joined in by all, is that the court did not define with enough specificity the federal right conspired against or, alternatively, described with specificity only the non-federal right of the victim to testify at a state trial. They claim that the charge violated the teachings of *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

There having been no objection, our standard of review is plain error. In looking for error, we are also instructed to view the charge as a whole. *Cupp v. Naughten*, 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In its charge on Count 1 the court defined the targeted federal right as "the right not to be deprived of liberty without due process of law." Admittedly, this is, as appellants point out, and appellee concedes, no more than a restatement of the due process clause. But in its charge under Count 2 and 18 U.S.C. § 242 (depriving a U.S. inhabitant of a federally protected right), the court said:

> As I previously instructed you, one of the liberties secured to the victim involved in this case by the Constitution is the liberty to be free from unlawful attacks upon her person.

> It has always been the policy of the law to protect the physical integrity of every person from unauthorized violence. Liberty thus includes the principle that no person may ever be physically assaulted, intimidated or otherwise abused intentionally and without justification by a person acting under the color of law of any state.

> With regard to the fourth element, which is willfulness, I instruct you that an act is done willfully if it is done voluntarily and intentionally and with a specific intent to do something the law forbids, that is with a bad purpose, to disobey or to disregard the law.

The court had earlier, in its instructions under Count 1, in conveying the substance of the conspiracy indictment to the jury, read that one of the overt acts charged was that "Arzola fired two shots into the body of [Jessica]."

■ The instructions fall within the bounds of contemporary holdings. For example, in *United States v. Dise*, 763 F.2d 586 (3d Cir.1985), a case involving beatings of mentally retarded inmates by an employee of a state institution, the court upheld the adequacy of a charge defining the federal right as the "right to be free from unwarranted ... intrusion ... upon one's

personal security and integrity" or, since the inmates' liberty was to some extent properly restricted, the "right to be free from excessive, unnecessary and unreasonable force at the hands of state employees who have proper and legal custody over them." *Id.* at 589. In the instant case we do not face the complicating factor of the possible justification of some use of force; Jessica was not under any lawful restraint and the force used was the ultimate. *See also United States v. Stokes*, 506 F.2d 771, 775 (5th Cir.1975).

We also find the following holding in *Dise* applicable to this case:

> We hold that when a person acting under color of state law invades the personal liberty of another, knowing that such invasion is in violation of state law, he has demonstrated bad faith and reckless disregard for constitutional rights.

506 F.2d at 592 (citations omitted).

■ A second challenge to the court's instructions is the absence of any instruction as to the requirement of "color of law" or state action. Although section 241 does not specify a "color of law" requirement, the Fourteenth Amendment requires it. *United States v. Price*, 383 U.S. 787, 799, 86 S.Ct. 1152, 1159, 16 L.Ed.2d 267 (1966). The court, however, did read to the jury that part of Count 1 containing the color of law requirement. And, in describing the liberty right at stake in Count 2, the section 242 violation of actual deprivation, the court made clear that the right was to be free of physical assault "by a person acting under the color of law of any state." There was no plain error.

Counsel for Lebron-Gonzalez has called our attention at oral argument to *United States v. Pope*, 561 F.2d 663 (6th Cir.1977), where a reading of the indictment was held not sufficient to cure the absence of any mention in the instructions of the requirement that there be an intent to distribute in addition to simple possession of narcotics. Such an omission was of the major part of the crime to be proved, distinguishing it from the lesser offense of possession. Here what was omitted was a technical prerequisite, obviously presenting no prob-

lem of proof, and directly addressed in the closely related other count. We hold that the omission of the words in the Count 1 part of the charge, in light of the instructions as a whole, does not rise to the significance of plain error.

### Alleged errors in instructions as to 18 U.S.C. § 242 (Count 2)

Appellant Arzola devotes 21 pages of his brief to documenting the principle that only the jury, and not the judge, can find the facts of a case. Arzola contends that the court violated this principle when, after defining the elements of the crime at issue on Count 2, alleging a violation of 18 U.S.C. § 242, it said,

> With regards to the first element, I charge you that you find that the named victim, Grisella Gonzalez Ortiz, was in fact present in the Commonwealth of Puerto Rico at the time of the incident charged in Count 2, that she was an inhabitant of a state, territory or district within the meaning of the statute.

█ The omission of an "if" after "I charge you that" seems so obvious that, had this dereliction been brought to the court's attention, it would have promptly and adequately clarified any misunderstanding. We are reinforced in our conviction that this was either an error of the reporter or a wholly unintended and unprejudicial comment of the judge. First, there is something grammatically missing in the sentence as transcribed. As it reads it has the court saying that the victim was in fact present in Puerto Rico and also (but without a connective "and") that she was an inhabitant. If the court had really been trying to take an issue away from the jury, it seems to us that it would have contented itself solely with the legally required fact that the victim was an inhabitant, rather than paying any attention to the predicate, evidentiary fact of presence. The passage parses sensibly only if the missing "if" is supplied. This brings us to our second point. In giving its substantially identical charge on the same count to Jury I (Catala's trial), the court said, "With regard to the first element of the offense in Count 2

I charge you that *if* you find that the named victim, Jessica, was in fact present ... then she was an inhabitant...." (Emphasis supplied).

Finally, we note that shortly before the passage in question, the court had prefaced its remarks by saying, "Remember at all times that you as jurors are at liberty to disregard all comments of the Court in arriving at your findings as to the facts." This case is quite different from *United States v. Argentine*, 814 F.2d 783 (1st Cir. 1987), where the court persisted in stating as fact that critical telephone conversations had occurred on two specific days over the continuing protests of counsel. If such an inconsequential lapse as this could be cause for reversal, too high a premium would be put on acquiescing in obvious slips of the tongue. We find no plain error.

A second claim, by appellant Rodriguez, is that the instructions allowed the jury to find the color of law requirement satisfied by a mere finding that one or more of the defendants were police officers at the time of the murder. The court's charge, however, was replete with the added requirement—"using or misusing the power," "pretense of law," "purported to act as police officers." The challenge lacks any support in the record.

### Residual challenges

█ *Denial of severance and double juries.* Two appellants, Catala and Rodriguez, assert error in the actions of the court in rejecting motions for severance and in impaneling two juries. The ruling was made in recognition of the fact that Catala's prosecution called for the jury to hear a quantity of taped conversations between the government's witness Ortiz and Catala, data not relevant to the other three defendants. The thrust of appellants' argument is directed at the refusal to sever. Appellant Catala merely notes that, although the Eleventh, Ninth, Sixth and D.C. Circuits have accepted the device of double juries, *United States v. Lewis*, 716 F.2d 16 (D.C.Cir.1983); *United States v. Hayes*, 676 F.2d 1359 (11th Cir.1982); *United States v. Rimar*, 558 F.2d 1271 (6th Cir.

1977); and *United States v. Sidman,* 470 F.2d 1158 (9th Cir.1972), we have not had occasion to rule on it. We see nothing in this case indicating an abuse of discretion by the court in impaneling two juries—who were at all times kept segregated from each other. Indeed, resort to this measure was a way of minimizing any prejudice from jointly trying the defendants.

The court, as all recognize, has a wide discretion in decisions to grant or refuse motions to sever. A defendant carries the heavy burden of making a strong showing of prejudice. *See, e.g., United States v. Turkette,* 656 F.2d 5 (1st Cir.1981). Fears of a jury's finding of guilt based on association are generally to be countered by cautionary instructions, *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954), which, in this case, were given several times. The principal specific objection was to the admission into evidence of a copy of Lebron's murder indictment and of Jessica's testimony at Lebron's preliminary hearing. The contention is that this evidence revealed Lebron's responsibility for two other murders—one to which Jose Rivera de Leon had been a sole witness and the other being the shooting of Rivera, to which Jessica was the sole witness. While such evidence is indeed prejudicial, it is of critical relevance in defining the aim of the conspiracy—to do away with Jessica because she was the key witness against Lebron—and was properly admitted. Fed.R.Evid. 403. Furthermore, the jurors were specifically instructed that the defendants were not on trial for murder, but only for violating Jessica's civil rights. *United States v. Moreno Morales,* 815 F.2d 725, 741–742 (1st Cir.1987).

Both appellants also claim separate violations of the rule in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). But the Lebron indictment and Jessica's testimony made no reference to Catala; and the taped conversations between Catala and Arzola and Arzola and his brother made no reference to Rodriguez. Appropriate limiting instructions were given in each instance. Catala's separate argument that severance was mandated because Arzola and Lebron were second and fourth offenders, while he and Rodriguez were not, lacks substance.

■ *Pre-accusation delay.* Appellant Catala contends that a four and one-half year delay between the murder (May 29, 1980) and the indictment (December 12, 1984) caused him to suffer severe prejudice in the fading memories of key witnesses, in the disappearance of certain documents and physical evidence, and in the changing tide of public opinion regarding the Puerto Rico police. We need not scrutinize these contentions to see whether in fact the witnesses would have materially aided his defense, or whether the vanished documents would have been admissible and exculpatory, because the standard imposed by *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), to test pre-indictment delay is a dual one. In addition to prejudice there must be an intent by the prosecution to gain a tactical advantage. Moreover, even though the prosecution has probable cause, it is under no duty to initiate criminal proceedings until it is satisfied that it can establish guilt beyond a reasonable doubt. *United States v. Lovasco,* 431 U.S. 783, 791, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1972). In the case at bar the key witness, Ortiz, did not begin to cooperate until after his arrest on June 8, 1984. The taped conversations with Catala took place in August and September of that year. We hold that the pre-indictment delay in this case did not violate due process.

Appellant Catala also protests the court's refusal to declare a mistrial after the outburst on the part of Jessica's mother. There is no indication that the jury knew the identity of the sobbing woman removed from the courtroom, nor the source of the overheard cries from the corridor. The sole prospective juror who was in the corridor at the time did not serve on either jury. We find no abuse of discretion in denying a mistrial.

■ We note some other contentions advanced only by or on behalf of appellant Catala to indicate that we have considered

them and find them without merit. First, Catala's objections to tapes recording his own conversations in 1984 miss the mark; they were admissible as admissions by a party. Fed.R.Evid. 801(d)(2); *United States v. Barletta*, 652 F.2d 218, 219 (1st Cir.1981). As for the admission of tapes of conversations by the brothers Arzola, no specific allegations of prejudice have been made except that the evidence may have associated appellant with two persons with criminal records. In light of all the evidence of Catala's role, we see no possible prejudice.

Catala also argues that it was error to allow one expert (Holt) to rely on notes of another expert in a different field (Quill), but the only request at trial was to have the latter's notes produced as exculpatory material. The court eventually ordered them to be produced. (Tr. 621, 633). Similarly, we find entirely unpersuasive his contention that there was insufficient evidence in support of his conviction. The evidence showed his continuing role, including handling the allocation of monies paid for the accomplishment of the conspiracy. Catala filed his own brief in support of his contention that the trial judge was unduly intrusive, chilling the efforts of counsel. Our reading of the transcript, however, reveals a judge dealing conscientiously with a complex and bizarre case, with four counsel representing defendants with much at stake. We see no such conduct as would tempt us to order reversal. Finally, we are satisfied that Catala's life sentence was sufficiently individualized and not the result of overlooking all proper considerations.

The remaining few contentions merit no comment.

*Affirmed.*