# United States Court of Appeals
## For the First Circuit

Nos. 24-1650, 24-1821

UNITED STATES OF AMERICA,

Appellee,

v.

SUNNA SEPETU and NAFIS QUAYE,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Samantha D. Elliot, U.S. District Judge]

Before

Gelpí, Thompson, and Dunlap,
Circuit Judges.

Emma Quinn-Judge, with whom Zalkind Duncan & Bernstein LLP, was on brief, for Appellant Sunna Sepetu.

Zainabu Rumala, with whom Federal Public Defender Office, was on brief, for Appellant Nafis Quaye.

Anna Z. Krasinski, Assistant United States Attorney, with whom Erin Creegan, United States Attorney, was on brief, for Appellee.

May 15, 2026

**DUNLAP, <u>Circuit Judge</u>**. Defendant-Appellant Nafis Quaye and Defendant-Appellant Sunna Sepetu (collectively "Defendants") appeal from the district court's final judgment entering guilty verdicts against them for money laundering conspiracy. The evidence adduced at trial showed that Quaye engaged in a years-long pattern of using his friends and family to register businesses and create bank accounts on his behalf, including an account operated by Sepetu. Quaye and Sepetu facilitated the transfer of illegally obtained funds in and out of these accounts under the guise of a business that purportedly bought goods domestically and shipped them to customers overseas. Both Defendants challenge the sufficiency of the evidence supporting their convictions, as well as the jury instructions issued by the district court on the issues of willful blindness and good faith. Sepetu separately challenges the propriety of the government's collective references to Defendants in its opening and closing arguments and the district court's calculation of her sentencing guidelines. We reject Defendants' arguments and affirm both their convictions and Sepetu's sentence.

## I.

Over a six-year period, Quaye directed his friends and family to register four business entities -- Easy Soft, Ken and K,

Micro Syncnetic, and Logitech[1] -- and open various bank accounts for the businesses on his behalf.  Quaye regularly facilitated large wire transfers in and out of those accounts, purportedly as part of a business operation in which he bought cars, computers, and other goods in the United States and shipped them to customers overseas.

Quaye represented that he entered this line of business after a trusted Ghanaian community member introduced him to a man named Samuel Ansah, whom Quaye believed to be a buyer in Ghana and owner of La Vita Ghana and SpeedPrints Ghana.  Quaye, however, never received payment directly from Ansah.

Quaye's operation followed a distinct pattern:  He would direct friends or family members to hold themselves out as owners of a business entity, and would then direct them to sign blank checks and make cash withdrawals on his behalf from the business bank accounts.  When a bank would close an account or when he would otherwise choose to close an account, Quaye would rely on his friends and family to open more new accounts on his behalf so that he could continue his operation.

As part of this operation and at Quaye's request, Sepetu -- who was romantically involved with Quaye -- registered

---

[1] Initially, Logitech was also named Easy Soft, but was later renamed Logitech.  For ease and avoidance of confusion, we refer to this business as Logitech.

a business called Logitech (initially registered as Easy Soft). She also opened three bank accounts for the business entity. After law enforcement learned of and began investigating this scheme, Sepetu told officers that Logitech was a business that she owned and ran out of her home, and variously stated that the business shipped computers and printers to customers overseas and that the business would buy anything -- including crushers[2] -- for anyone.[3] Within days of receiving funds in the Logitech account, Sepetu, under Quaye's direction, would wire funds to various entities and send Quaye screenshots confirming the transactions. When questioned by law enforcement, Sepetu could not answer basic questions about Logitech's operations, including its sales, volumes, and profits. She nonetheless claimed that she believed Logitech was a legitimate business and that she never "became suspicious about" the source of its funds.

While Quaye and Sepetu operated these business entities, Maryann Schirmer, the victim in this case, began communicating with a man purportedly named Shawn Walker on a dating website and developed what she thought was a romantic relationship with him. "Walker" asked Schirmer for money, under the guise of needing

---

[2] A law enforcement agent described a crusher as "a large construction machinery that rips up stone and turns it into aggregate."

[3] When questioned at trial, however, Sepetu said Quaye did not share with her what items Logitech would buy and sell.

- 4 -

assistance with a variety of expenses, and directed her to wire it to the Easy Soft, Ken and K, Micro Syncnetic, and Logitech accounts. From 2014 to 2019, Schirmer wired more than three million dollars to those accounts, including $827,000 into the Logitech account controlled by Sepetu. Unbeknownst to Schirmer, Ansah -- whom she did not know -- had been posing as Walker. Neither Quaye nor Sepetu knew Schirmer. And while Quaye knew Ansah's wife, Sepetu did not know Ansah. Further, except for a 2015 email from the "Shawn Walker" email account to an Easy Soft account confirming a wire transfer, no direct evidence connected Quaye or Sepetu to Ansah's romance scam.

Each of Schirmer's wire transfers showed that the funds originated from a U.S.-based account under her name: "Maryann K Schirmer." Most of the funds were earmarked for "investment," and some were earmarked for "services." These transfers constituted most of the incoming funds in Quaye and Sepetu's accounts, including, for example, 88% of funds sent to an Easy Soft account at Santander Bank, 68% of funds sent to a Ken & K account at Bank of America, 93% of funds sent to a Micro Syncnetic account at Bank of America, and 83% of funds sent to a Logitech account at Bank of America. Quaye variously claimed that Schirmer was an owner or CEO of a car dealership, and that Quaye purchased computer products for Schirmer.

- 5 -

Quaye and Sepetu withdrew significant amounts of cash from the accounts, at times up to and exceeding hundreds of thousands of dollars. For example, Quaye withdrew over $246,000 from one Easy Soft account, reflecting more than 50% of the money wired by Schirmer to that account, and over $249,000 from a second Easy Soft account, reflecting more than 87% of the money wired by Schirmer to that account. Sepetu withdrew over $62,000 from the Logitech account, and she sent over $36,000 from the account to Quaye. Quaye and Sepetu used funds from the accounts for personal expenses, such as retail and luxury purchases, club expenditures, and travel expenses unrelated to their purported business. With respect to the Logitech account, with Quaye's permission, Sepetu used funds for gas, food, spa and salon expenses, and retail purchases. Personal expenses paid from the Logitech account totaled nearly $32,000.

After opening one of the Easy Soft accounts in July 2014 and facilitating numerous wire transfers and cash withdrawals, Quaye was contacted by the compliance division at Santander Bank and questioned regarding "[t]he origin of" those transfers and "the use for th[e] funds." Quaye characterized the funds as "business transactions" meant for him to "buy printing machines and cars that he needed to send to another country." Santander closed that account in September 2015 after it was overdrawn. Similarly, in February 2019, law enforcement questioned Sepetu

about the source of the wire transfers into the Logitech account. They specifically inquired whether "anything illegal was going on at Logitech," which Sepetu denied. Even after these inquiries, Quaye and Sepetu continued to accept funds from Schirmer -- including five wires to the Logitech account totaling over $190,000 -- and similarly continued to withdraw and spend cash.

Although the type of business operation that Quaye and Sepetu were allegedly part of would involve paperwork such as titles, bills of lading, and bills of sale, Quaye did not have records of such business transactions. Sepetu likewise did not maintain such records and told agents that she "would have to talk to her friend" to get invoices that Logitech paid related to the transactions. She ultimately produced three invoices, none of which referenced Logitech or Quaye's other business entities. Sepetu conceded that "she wasn't sure th[ey] were the invoices that relate[d] to the wires" and that she "didn't have any further documentation" of Logitech's transactions. Except for one text message to Quaye generally inquiring about "fil[]ing taxes," and another requesting Logitech's "estimated gross income a year," Sepetu did not seek information about the business, including the source of its funds.

A grand jury returned an indictment charging Quaye and Sepetu with conspiracy to commit money laundering in violation of

18 U.S.C. § 1956(h) and 18 U.S.C. § 1956(a)(1)(B)(i). They were tried jointly. At trial, both Quaye and Sepetu testified that they lacked knowledge of the illegal source of the funds. Nonetheless, the jury found Quaye and Sepetu guilty. This appeal followed.

## II.

Defendants raise several challenges to the trial proceedings. They each argue that the evidence was not sufficient to support the jury's verdict, and that the district court erred by both providing a willful blindness instruction and declining to provide Defendants' proposed good faith instruction. Sepetu separately contends that the government improperly argued for Sepetu's guilt by association to Quaye during opening and closing arguments and challenges the district court's calculation of her guideline range. We address each argument in turn.

### A. Trial Challenges

#### 1. Sufficiency of Evidence

Defendants assert that the evidence adduced at trial failed to establish beyond a reasonable doubt that they knowingly agreed to launder fraud proceeds. They highlight the lack of direct evidence showing their involvement in the romance scam perpetrated against Schirmer. We disagree because the circumstantial evidence sufficed to support a jury verdict that

Defendants had actual knowledge of, or were at least willfully blind to, the unlawful origins of the proceeds.

Federal Rule of Criminal Procedure 29 "provides that a court may acquit a defendant if the evidence is insufficient to establish factual guilt." United States v. Pérez-Greaux, 83 F.4th 1, 23 (1st Cir. 2023); Fed. R. Crim. P. 29(c)(2). We "review a district court's determination on a Rule 29 motion for acquittal de novo, viewing the evidence in the light most favorable to the government." Id. That means we "must credit the government's witnesses, draw all reasonable inferences in its favor, and uphold the verdict if it is 'supported by a plausible rendition of the record'" without "re-weigh[ing] the evidence or second-guess[ing] the jury's credibility determinations." Id. (quoting United States v. Bobadilla-Pagán, 747 F.3d 26, 32 (1st Cir. 2014)). "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, the court must reverse the conviction." United States v. Coleman, 149 F.4th 1, 42 (1st Cir. 2025) (citation modified) (quoting United States v. Morillo, 158 F.3d 18, 22 (1st Cir. 1998)). "A verdict satisfying this standard may be supported by circumstantial evidence alone"; however, we will neither "give credence to evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative," nor "stack inference upon

- 9 -

inference in order to uphold the jury's verdict." United States v. Burgos, 703 F.3d 1, 10 (1st Cir. 2012) (citation modified) (first quoting Morgan v. Dickhaut, 677 F.3d 39, 47 (1st Cir. 2012); and then quoting Leftwich v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008)).

To sustain Defendants' convictions, the evidence must be sufficient to show that (1) "a conspiracy existed," (2) they "had knowledge of the conspiracy," and (3) they "knowingly and voluntarily participated in the conspiracy." Burgos, 703 F.3d at 10 (quoting United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011)). "Knowledge" of a conspiracy can be established either "with evidence of actual knowledge or with evidence of willful blindness," id. at 11, the latter meaning that Defendants were aware of a high probability of conspiracy but "consciously and deliberately avoided learning of [it]," id. at 11 (quoting United States v. Lizardo, 445 F.3d 73, 85 n.7 (1st Cir. 2006)); see United States v. Azubike, 564 F.3d, 59, 66 (1st Cir. 2009). As for the requirement that Defendants "knowingly and voluntarily participated in the conspiracy," "the evidence must establish that they both intended to join the conspiracy and intended to effectuate the objects of the conspiracy." Id. at 11 (citation modified). The underlying money-laundering offense further requires a showing that Defendants knew that (1) "the funds involved in the financial transaction were the proceeds of some

unlawful activity," and (2) "the transaction itself was 'designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of such unlawful activity.'" United States v. Frigerio-Migiano, 254 F.3d 30, 33 (1st Cir. 2001) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)).

There can be no conspiracy to commit money laundering where a defendant lacks knowledge of -- and did not deliberately avoid knowledge of -- the illegal source of funds. Id. A defendant need not, however, "know the precise origin" of the funds, but "only that [they] came 'from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law.'" United States v. Cedeno-Perez, 579 F.3d 54, 59 (1st Cir. 2009) (quoting 18 U.S.C. § 1956(c)(1)). Here, despite the lack of direct evidence showing that Defendants knew about the romance scam, circumstantial evidence supported the jury's finding that Defendants had actual knowledge, or at least remained willfully blind to, the illegality of the transferred funds.

As a general matter, Defendants engaged in an unusual pattern of (1) establishing numerous business accounts under the names of Quaye's family and friends, including Sepetu, (2) receiving large transfers of funds to those accounts, and (3) swiftly wiring funds out of the accounts to other entities. Given the absence of business records providing a legitimate

- 11 -

explanation for this pattern, a jury could reasonably construe it as an effort by Defendants to conceal the source of the funds, suggesting that they either knew or remained willfully blind to the funds' illegal inception. See United States v. Adorno-Molina, 774 F.3d 116, 125 (1st Cir. 2014) (explaining that "use of straw owners to purchase vehicles" and "frequent cash transfers between" conspirators contributed to circumstantial evidence sufficient to find that the defendant knew funds were laundered or ignored "warning signs" of money laundering conspiracy); United States v. Rivera-Rodriguez, 318 F.3d 268, 272 (1st Cir. 2003) (concluding that "more than one [] venture" involving "very large cash transactions" with "concealment" and "false ownership" demonstrated a "pattern" that a jury could reasonably construe as "an effort to launder illegally obtained proceeds").

Moreover, despite Defendants' purported business of buying goods domestically to export to buyers in Ghana, bank records confirm that the transfers to their business accounts all originated from a U.S.-based account owned by Schirmer, most of which were earmarked for "investment." The Logitech account specifically received at least sixteen such transfers over just nine months, accounting for $827,000 total and eighty-three percent of its received funds. Viewed in the light most favorable to the government, these repeated, large transfers within a short period -- all originating from Schirmer's U.S.-based account -- to

- 12 -

Quaye's and Sepetu's accounts could lead a jury to conclude that, at the very least, Quaye and Sepetu ignored a red flag indicating that the funds were not coming from a legitimate Ghanaian business.

The absence of legitimate business records, specifically any "invoices documenting the source of the[ir] [received] funds," further supports our conclusion that the defendants knew or were willfully blind to the illicit source of funds. United States v. Flores, 454 F.3d 149, 156 (3d Cir. 2006). In total, Defendants provided just three invoices. Two were from La Vita to Shop Car Parts Ghana Ltd., and one was from Sigma to First Core Quarry Limited. None referenced Defendants' business entities. Quaye identified one text message where he asked Sepetu to transfer funds to Sigma, along with a bank record confirming that transfer, as evidence that he "operated an exporting business" and "transferred money for . . . commercial activities." But as the law enforcement agent who examined Quaye's phone testified, Quaye overall had "very little communication[] regarding the type of business activity" that he "purported to be involved in." A jury could reasonably rely on this lack of documentation as additional support for the conclusion that Quaye's and Sepetu's businesses were illegitimate.

As to Sepetu specifically, although she sent Quaye screenshots of his requested wire transfers to various entities, she admitted that she "didn't have any further documentation" of

Logitech's transactions, such as invoices documenting purchases by its purported customers. Although Sepetu suggests that she maintained appropriate records "with respect to her own role" at Logitech, in which she "did not claim to . . . set[] up transactions to export computers," this suggestions stands in significant tension with the story Sepetu told law enforcement: that "Logitech Group was her business," that she "works out of her house," and that her business involved "the purchase of computers and printers and computer parts for customers in Africa." A jury could reasonably construe these statements as showing that Sepetu played an active role in Logitech's export operations and thus would have had reason and opportunity to document those transactions if they actually occurred. The jury could similarly conclude that her failure to do so suggests that she knew the business was a sham.

Sepetu argues that the evidence simply "demonstrate[s] her lack of knowledge" about Logitech's operations and that she "trusted her long-term partner and assisted him by operating a business account." Again, her statements to law enforcement suggest otherwise. But even accepting this premise, given the lack of records and large amounts of money flowing in and out of Logitech's account, "warning signs existed" that were "sufficient to put" Sepetu "on inquiry notice" regarding the legitimacy of the purported business operations. See United States v. Singh, 222

F.3d 6, 11 (1st Cir. 2000). Sepetu insists that she tried to learn about the business when she "asked Quaye about [its] profits and tax obligations," but she cites just two general text messages, neither of which inquired about the source of the funds. Her choice not to question Logitech's business activity more extensively indicates that she remained intentionally ignorant of warning signs. See Singh, 222 F.3d at 11 (explaining that willful blindness may exist where "the defendant claims to lack guilty knowledge, yet the evidence, taken in the light most favorable to the government, suffices to support an inference that he deliberately shut his eyes to the true facts").

Further, despite representing that their business did not generate large profits, Defendants made significant personal expenditures from the funds in their accounts. They took tens of thousands of dollars in cash withdrawals and direct transfers from the Logitech account alone, and they spent money at, for example, retail and luxury stores, and clubs. Sepetu contends that she received permission from Quaye for personal expenditures from the Logitech account and that Quaye made such expenditures on her behalf, but that does not change the fact that she either made those expenditures or knew about them. Defendants' pattern of gratuitous spending against a backdrop of purportedly thin profits supports a finding that there was no legitimate business and that they knew the funds did not come from a legitimate source. See

- 15 -

United States v. Corchado-Peralta, 318 F.3d 255, 258 (1st Cir. 2003) (holding that there was sufficient evidence of knowledge that funds were illegal where "expenditures were huge, [] reported income was a fraction of what was being spent[,] and [] legitimate sources were not so obvious as to banish all thoughts of possible illegal origin").

Defendants additionally gave conflicting accounts of their business throughout the investigation. For example, "[a]t first [Quaye] described [Ansah] to be the one in charge of Logitech" but then changed his story to say that Ansah "was the one in charge of La Vita in Ghana." Sepetu likewise wavered in her accounts by first representing to law enforcement that "Logitech Group was her business" and that she "work[ed] out of her house," but later claiming that she did not know basic information like "how much profit [Logitech] made or sales" and that she would have to "talk to her friend" to obtain business records. Viewed in the light most favorable to the government, a jury could reasonably construe Quaye's and Sepetu's varying stories as evidence that they knew that they were participating in a money laundering scheme.

Finally, Quaye and Sepetu were alerted to, but ignored, concerns about the irregular activity in their accounts. Indeed, Quaye enlisted family and friends to open other businesses and bank accounts to receive Schirmer's funds even after the compliance

division at Santander Bank raised questions as to "[t]he origin of where the money" for the wire transfers "was coming from" and "the use for those funds." Similarly, despite receiving inquiries from law enforcement as to whether "anything illegal was going on at Logitech," Sepetu continued to accept and forward wire transfers and withdraw and spend cash from the Logitech account. Defendants' disregard of these inquiries and failure to probe the areas of concern raised by both Santander and law enforcement suggest that they knew of or deliberately ignored the illegitimacy of the contested funds. See United States v. Abbas, 100 F.4th 267, 289 (1st Cir. 2024) (concluding that a "jury could infer that [the defendant] 'had general knowledge' of the money's 'criminal nature'" where "a bank investigator informed [the defendant] about the suspicious nature of [a] wire" but the defendant continued to "receive[] fraudulent funds through identical circumstances" (quoting United States v. Rivera-Izquierdo, 850 F.3d 38, 49 (1st Cir. 2017))).

Viewing this evidence as a whole and in the light most favorable to the government, we conclude that it was sufficient to support that Defendants knew -- or at least remained willfully blind to -- the illegal source of the transfers to their accounts, which, in turn, supports the jury's guilty verdicts on money laundering conspiracy.

## 2. Jury Instructions

Defendants also raised two arguments regarding the adequacy of the district court's jury instructions. Neither argument persuades us.[4]

### a. Willful Blindness

Defendants first argue that the district court erred by giving a willful blindness instruction because there is no evidence that they "engaged in a conscious course of deliberate ignorance." Although "[t]his court has been inconsistent as to the standard of review that applies when reviewing a preserved challenge to a willful blindness instruction, at times reviewing such challenges de novo, and at others for abuse of discretion," United States v. Evans, 143 F.4th 1, 9 n. 2 (1st Cir. 2025), Defendants' argument fails under either standard.

Over defense counsel's objection, the district court provided the following willful blindness instruction with respect to the money-laundering component of the charge:

> In deciding whether a defendant acted knowingly, you may infer that the defendant had knowledge of a fact if you find that he or she deliberately closed his or her eyes to a fact that otherwise would have been obvious to

---

[4] Sepetu separately argues that "[e]ven if no single error independently requires reversal, the combined effect of the district court's instructional rulings and the prosecutor's closing argument denied Sepetu a fair trial" and thus warrants a new trial. Because we hold that no error occurred, there was no prejudice to Sepetu and any argument of cumulative error necessarily fails.

him or her. In order to infer such knowledge, you must find that two things have been established. First, that the defendant was aware of a high probability of the fact in question. Second, that the defendant consciously and deliberately avoided learning of the fact. That is to say, the defendant willfully made himself or herself blind to the fact. It is entirely up to you to determine whether he or she deliberately closed his or her eyes to the fact, and if so, what inference, if any, should be drawn. However, it is important to bear in mind that mere negligence or mistake in failing to learn the fact or legal requirement is not sufficient. There must be deliberate effort to remain ignorant of the fact.

With respect to the conspiracy component of the charge, the district court further instructed the jury as follows:

As I described with regard to money laundering, you may, but you are not required to, infer actual knowledge based on evidence of willful blindness, that is, awareness of a high probability of the fact in question and conscious and deliberate avoidance of learning the fact in question. You can refer to the instructions for money laundering for a fuller description of knowledge and willful blindness.

"A willful blindness instruction is appropriate if (1) a defendant claims a lack of knowledge, (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge." Azubike, 564 F.3d at 66. "Direct evidence of willful blindness is not required; what is needed are sufficient warning signs that call out for investigation or evidence of

- 19 -

deliberate avoidance of knowledge." Id. "The evidence is reviewed in the light most favorable to the government." Id.

Defendants do not dispute the first and third elements. As for the second element, Defendants argue that the district court's instructions improperly permitted a conviction based on a finding that they merely "should have known" of the illegal source of the transferred funds. To the contrary, the instructions demanded that any conviction rest on a finding that Defendants had the requisite mental state -- namely, that they "deliberately closed [their] eyes," "consciously and deliberately avoided learning of," and "willfully made [themselves] blind to" the funds' illegality. Nowhere did the instructions suggest that negligence was enough.

Moreover, as recounted above, the evidence is sufficient to support that Defendants engaged in a conscious course of deliberate ignorance. Defendants challenge the government's reliance on the same evidence that it used to argue actual knowledge, but this court has never indicated that "the set of evidence supporting an inference of willful blindness cannot be contained within a larger set of evidence that, in the alternative, could support a finding of actual knowledge, or even that the two sets cannot completely overlap." Id. at 68. Here, the evidence at least shows "warning signs" indicating fraudulent activity that, when coupled with Defendants' failure to inquire about or

document the source of the funds, supports a finding that they deliberately avoided such knowledge (if they did not have actual knowledge). Id. at 66. The government was not required to show that Defendants actively shut down conversations or expressly refused information; their refusal to investigate red flags sufficed to establish willful blindness. See Adorno-Molina, 774 F.3d at 125 (upholding willful blindness instruction where "the record evidence reveal[ed] 'flags' of suspicion that, uninvestigated, suggest[ed] willful blindness" (quoting Azubike, 564 F.3d at 66)). Based on this evidence, the district court properly provided a willful blindness instruction.

### b. Good Faith

Defendants next argue that the district court erred by declining to issue a good faith instruction with their proposed language, including that good faith "is a complete defense to the charge." We review de novo a district court's refusal to give a requested jury instruction. United States v. Figueroa-Lugo, 793 F.3d 179, 191 (1st Cir. 2015). We find no error here.

Defendants requested the following jury instruction on good faith:

> The "good faith" of a Defendant is a complete defense to the charge in the indictment because good faith on the part of the Defendant is, simply, inconsistent with both knowingly and willfully agreeing to be a member of the alleged conspiracy and specifically intending that a member of the

alleged conspiracy would commit criminal conduct . . . . An honest mistake in judgment does not rise to the level of criminal conduct . . . . Therefore, if the evidence in this case leaves you with reasonable doubt as to whether Ms. Sepetu acted with criminal intent or in good faith, you should find her not guilty.

Declining to adopt Defendants' proposed instruction, the district court instead instructed the jury that "the government must prove beyond a reasonable doubt that the defendant knowingly, willfully, and intentionally joined in the conspiracy," including that the defendant had "knowledge of the conspiracy and its purpose, an intent to agree to the conspiracy, and an intent to achieve the conspiracy's unlawful objectives." The district court further instructed that:

A defendant does not act knowingly, willfully, or intentionally if his or her conduct is involuntary or if it is the result of an accident, mistake, or a misunderstanding that prevents the defendant from acting with the required intent. If the evidence leaves a reasonable doubt as to whether the defendant acted with criminal intent as opposed to acting in good faith, you should find the defendant not guilty.

The district court finally instructed that "[a] person who has no knowledge of the conspiracy but simply happens to act in a way that furthers some object or purpose of the conspiracy is not a conspirator."

"Jury instructions are to be evaluated in the context of the charge as a whole, and a defendant has no absolute right to

the use of particular language." United States v. Dockray, 943 F.2d 152, 154 (1st Cir. 1991). "The refusal to give a requested instruction constitutes a reversible error 'only if the instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense.'" United States v. González-Pérez, 778 F.3d 3, 15 (1st Cir. 2015) (quoting United States v. González-Soberal, 109 F.3d 64, 70 (1st Cir. 1997)). "Under the third requirement, 'reversal is not required unless a defendant suffers substantial prejudice.'" Id. (quoting United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008)).

The district court provided proper instructions here. "Although good faith is an absolute defense" to money laundering conspiracy, a court "need only convey the substance of the theory to the jury." Dockray, 943 F.2d at 155. "[W]here the court properly instructs the jury on the element of intent . . . -- essentially the opposite of good faith -- a separate instruction on good faith is not required." Id.; see United States v. Goodspeed, 977 F.2d 566, *2 (1st Cir. 1992) ("We have already explicitly declined to follow the rulings . . . which require a separate good faith instruction despite a clear and accurate instruction on the necessity of finding specific criminal

intent."). Here, not only did the court's charge "explicitly mention[] . . . good faith" -- albeit not in the precise fashion that Defendants proposed -- but it also "unambiguously put the jury on notice that the government had to prove beyond a reasonable doubt" specific intent. United States v. Arcadipane, 41 F.3d 1, 8 (1st Cir. 1994). Nothing more was required.

### 3. Opening and Closing Argument

Sepetu argues that the government's references to "the defendants" collectively during its opening and closing arguments "misstated the evidence" and "invited guilt by association." We review unpreserved claims of prosecutorial misconduct in opening and closing argument, as here, for plain error only. United States v. Wilkerson, 411 F.3d 1, 7 (1st Cir. 2005). That "requires determining whether an error occurred which was clear or obvious and which not only affected the defendant's substantial rights but also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. We find no such error.

Sepetu specifically contends that "the trial record revealed a stark disparity" between herself and Quaye because only Quaye "was linked to Easy Soft, Ken and K, and Micro Syncnetic," while she "was tied only to the . . . Logitech account." According to Sepetu, the government improperly grouped her with Quaye when she "was connected to" only "a fraction of the[] transactions." It is true that the government may not argue for the conviction of

one defendant merely based on association with another defendant. See United States v. Dworken, 855 F.2d 12, 31 (1st Cir. 1988). And "[t]he threat of guilt by association is perhaps greatest where the defendant has done little but is closely associated with others already known to have been convicted or, more often, who are co-defendants or alleged co-conspirators whose patent wrongdoing is brought out in detail in the trial." United States v. Allen, 670 F.3d 12, 16 (1st Cir. 2012). But here, although Quaye facilitated more transfers to more accounts than Sepetu did, evidence of Sepetu's own conduct -- including her receipt of more than $800,000 from Schirmer into the Logitech account, which she opened and managed -- supplied the basis for her conviction. The government's references to "the defendants'" conduct -- including the accounts associated with both Defendants, the flow of funds in and out of those accounts, Defendants' knowledge of Schirmer's name on the wire transfers, and Defendants' personal spending from the accounts -- appropriately encompassed Sepetu's own conduct. Similarly, both Defendants proffered an innocent-business defense, wherein Sepetu specifically claimed that she worked in the export business and relied on Quaye for record-keeping; therefore, the government appropriately referenced Defendants collectively when refuting this defense at closing.

In any event, "[f]ears of a jury's finding of guilt based on association are generally . . . countered by cautionary

instructions." United States v. Lebron-Gonzalez, 816 F.2d 823, 831 (1st Cir. 1987); see Opper v. United States, 348 U.S. 84, 95 (1954). Here, the district court stressed that "[t]here are two defendants on trial" and that the jury "must as a matter of law consider each defendant's guilt separately." It instructed the jury to "bear in mind that guilt is personal and individual," meaning that their "verdict of guilty or not guilty must be based solely upon the evidence about each defendant." It further instructed that "[t]he case against each defendant stands or fails upon the proof or lack of proof against that defendant alone, and your verdict as to one defendant should not control your decision as to the other defendant." Even had the government committed any error in its closing argument, these instructions would have cured it.[5]

---

[5] Sepetu cites cases where "improper remarks" in the government's argument "[we]re particularly severe or pervasive" such that "general instructions may not be sufficient to neutralize them." The collective references to the "Defendants" here fall far from the same level of severity or pervasiveness. See United States v. Canty, 37 F.4th 775, 788 (1st Cir. 2022) (government argued that (1) "it was the defendants' 'turn' to go to jail because other coconspirators . . . had gone to jail"; (2) "the[] other coconspirators who had gone to jail were" more culpable than defendants; and (3) another person "was sitting in jail for [the defendant's] crime"); United States v. Ayala-Garcia, 574 F.3d 5, 19 (1st Cir. 2009) (government suggested that "the defendants were potential killers who would have murdered thirty-one individuals if they had not been arrested").

**B.  Sentencing**

Sepetu separately challenges the procedural reasonableness of her sentence, arguing that the district court improperly relied on a finding that she "personally caused substantial financial hardship" in calculating her guidelines range.  We review preserved sentencing challenges for abuse of discretion.  United States v. Delgado, 106 F.4th 185, 191 (1st Cir. 2024).  "A district court commits a procedural error by, among other things, 'selecting a sentence based on clearly erroneous facts.'"  Id. (quoting United States v. Contreras-Delgado, 913 F.3d 232, 238 (1st Cir. 2019)); see Gall v. United States, 552 U.S. 38, 51 (2007).  Importantly, however, even if a procedural error occurred, it does not mandate reversal and "will be found harmless if 'it is highly probable that the challenged action did not affect the judgment.'"  United States v. Romero-Carrion, 54 F.3d 15, 18 (1st Cir. 1995) (quoting United States v. Noone, 913 F.2d 20, 36 (1st Cir. 1990)).  We need not determine whether any procedural error occurred here because, even if it did, it was harmless.

The district court applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(2)(A) based on a finding that the offense conduct resulted in "substantial financial hardship" to Schirmer. The district court credited Schirmer's sworn declaration that she suffered a ten-million-dollar tax penalty because of the offense

conduct. It stressed, however, that "none of [its] rulings on the[] sentencing calculations [we]re going to affect that actual sentence that [it] impose[d] in the case" because it was "prepared to grant a substantial variance." Sepetu's counsel nonetheless objected to the enhancement, arguing that Schirmer's declaration was unreliable, and the court overruled that objection. Similarly, the district court declined to apply a two-level reduction under U.S.S.G. § 4C1.1(a) based on a finding that Sepetu "personally cause[d] substantial financial hardship." But the district court reiterated that it "[could not] stress . . . enough" that while it sought the correct guidelines range, "everyone, including the government, [wa]s asking for a downward variance," and so the resulting guidelines range would not inform any "objective sentence." The district court ultimately calculated a guidelines range of sixty-three to seventy-eight months, but it varied downward and imposed a sentence of just twelve months and one day.

Sepetu argues that the district court's reliance on Schirmer's sworn declaration "conflicted with the government's pre-trial disclosure that Schirmer told prosecutors 'she has been involved in a dispute with the IRS over the last several years arising out of her accountant's failure to file her taxes while he was suffering from dementia.'" Regardless of whether the district court abused its discretion, however, any error was harmless

because it did not affect Sepetu's sentence. "[W]e have consistently held that when a sentencing court makes clear that it would have entered the same sentence regardless of the Guidelines, any error in the court's Guidelines calculation is harmless." United States v. Rivera, 51 F.4th 47, 53 (1st Cir. 2022) (quoting United States v. Ouellette, 985 F.3d 107, 110 (1st Cir. 2021)). Here, the district court "explicitly stated that it would impose an identical sentence without regard to the sentencing guidelines," including any determination as to the cause of Schirmer's financial hardship. Id. Therefore, "any error in the guideline calculations -- even if one occurred -- [was] harmless." Id.

## III.

For the above reasons, we **affirm** both Defendants' convictions and Sepetu's sentence.